Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/13/2024 09:09 AM CST

Courtney Galloway, appellant, v.
Husker Auto Group, LLC, appellee.

___ N.W.3d ___

Filed December 13, 2024.    Nos. S-23-899, S-23-944.

1. **Summary Judgment: Appeal and Error.** An appellate court reviews rulings on a motion for summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.

2. \_\_\_\_: \_\_\_\_. An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

3. **Summary Judgment.** Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

4. **Summary Judgment: Proof.** The party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial. If the burden of proof at trial would be on the nonmoving party, then the party moving for summary judgment may satisfy its prima facie burden either by citing to materials in the record that affirmatively negate an essential element of the nonmoving party's claim or by citing to materials in the record demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.

5. **Summary Judgment.** In the summary judgment context, a fact is material only if it would affect the outcome of the case.

6. **Employer and Employee: Discrimination: Proof.** In cases involving claims of employment discrimination, Nebraska courts recognize a burden-shifting analysis. First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry the burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

7. **Termination of Employment: Proof.** The plaintiff in a retaliatory discharge action retains the ultimate burden of persuading the fact finder that he or she has been the victim of intentional impermissible conduct.

8. **Fair Employment Practices: Proof.** In order to show retaliation under the Nebraska Fair Employment Practice Act, a plaintiff must establish (1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse action.

9. **Fair Employment Practices: Words and Phrases.** The "practice" in Neb. Rev. Stat. § 48-1114(1)(c) (Reissue 2021) refers to an unlawful practice of the employer.

Appeals from the District Court for Lancaster County, RYAN S. POST, Judge. Reversed and remanded for further proceedings.

Kathleen M. Neary, of Powers Law, for appellant.

Cathy S. Trent-Vilim and Eric W. Tiritilli, of Lamson, Dugan & Murray, L.L.P., and Carrie McAtee, of Shook, Hardy & Bacon, L.L.P., pro hac vice, for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

FUNKE, J.

## I. INTRODUCTION

Courtney Galloway sued her employer, Husker Auto Group, LLC (Husker Auto), alleging (1) retaliation in violation of

the Nebraska Fair Employment Practice Act (NFEPA)[1] and (2) wrongful discharge under Nebraska's public policy exception to the at-will employment rule. Specifically, Galloway claimed her employment was terminated in retaliation for her role in investigating the alleged fraud of a fellow employee. Galloway also claimed that Husker Auto must have been aware of and benefited from the scheme. The district court ultimately granted summary judgment in favor of Husker Auto, finding no material issue of fact because the alleged unlawful acts were not those of Husker Auto, but those of its employee. Galloway appeals. Because we are not persuaded that there were no material issues of fact in dispute, we reverse the decision of the district court and remand the cause for further proceedings.

## II. BACKGROUND

### 1. Galloway's Firing and Subsequent NEOC Claim

In January 2019, Galloway was fired from her position as the used car sales manager at Husker Auto only a couple of months after reporting what she believed was a fraudulent sales scheme occurring within Husker Auto. Following her termination from employment, Galloway filed a claim with the Nebraska Equal Opportunity Commission (NEOC), alleging that she had been "discriminated against on the basis of whistleblower retaliation, in violation of . . . the [NFEPA]." In the claim, Galloway briefly detailed the fraudulent scheme and her role in reporting the activity, and she alleged that she was not given any reason for the termination.

### 2. Deposition Testimony

Because Galloway's NEOC filing provided only a cursory view of the alleged scheme, the subsequent overview of that

---

[1] Neb. Rev Stat. § 48-1114(3) (Reissue 2021).

scheme is based, primarily, on Galloway's deposition testimony. Additional factual information will be presented later in the opinion as relevant to the parties' arguments on appeal, but generally speaking, the relevant facts are as follows.

### (a) Organization of Husker Auto

Husker Auto has a GMC, Cadillac, and Chevrolet dealership and a separate Mercedes-Benz and BMW dealership, both in Lincoln, Nebraska. In October 2017, Galloway was hired as the used car manager for Husker Auto's Mercedes-Benz and BMW dealership, known as the Highline dealership. It was agreed, at that time, that her employment would be "'at-will.'"

The dealership also employed Ryan Mathis, who was Galloway's counterpart as the new car manager for the Highline dealership, and Macy Muncrief, who served as the finance manager for both dealerships during all relevant times. Mathis was someone Galloway considered to be a peer, and both Galloway and Mathis reported directly to Mike Burns, who was the acting general manager of the Highline dealership. Terry Zimmerman was the general manager of the parallel GMC dealership.

Above Burns and Zimmerman in the chain of command were Steve Kurtz, the official general manager, and John Kelly, the regional operations manager. These four individuals, Burns, Zimmerman, Kurtz, and Kelly will, collectively, be referred to as "upper management" for purposes of this opinion.

Although the parties dispute the impact of being on the management team, it is clear that all of the above-mentioned individuals, including Galloway, Mathis, and Muncrief, constituted part of the broader management team, a position which granted each member the power to hire and fire other individuals.

### (b) Alleged Straw Scheme

Galloway testified that after listening to voicemails from parents complaining that their children had received sales tax forms for luxury vehicles they did not own, Galloway became

suspicious that Mathis was engaging in a fraudulent scheme to sell particular Mercedes-Benz vehicles to straw purchasers to evade state sales tax and the Mercedes-Benz export policy. Galloway also suspected that Muncrief, the finance manager, and two other car salespersons were involved in the scheme. Based on the dealership's compensation structure, which allowed salespersons and managers to receive a portion of net profits on each vehicle sale, Galloway believed that upper management was benefiting from the scheme, as well. She shared her suspicions with her supervisor, Burns, who, allegedly, asked her to investigate.

In October 2018, Galloway presented a folder of her investigative findings to Burns in a private meeting. Around that same time, Galloway expressed concerns about being fired due to her involvement in the investigation. According to Galloway, Burns told her not to worry, because there was not a risk of future termination.

Galloway subsequently testified that after their private meeting, she saw Burns meet with the rest of upper management and share the results of her investigation with them. Galloway was not included in the meeting and could not hear what was said during the meeting.

(c) Termination of Employment

In December 2018, Burns retired and Kurtz assumed his duties. On January 3, 2019, Kurtz fired Galloway, and on January 4, Kurtz fired Mathis, as well.

Galloway testified that the only explanation she received for the termination of her employment was that the dealership was "going a different direction." Husker Auto, however, maintained that Galloway was fired due to her poor sales performance, which it claims later contributed to the restructuring of the dealership. Additional deposition testimony confirmed that after the terminations, the dealership was restructured in such a manner that only one individual was hired to fill the positions of Burns, Galloway, and Mathis.

(d) Evidence of Unprofitability
of Highline Dealership

Because one of the alleged reasons for the termination of Galloway's employment was her poor performance, deposition testimony frequently discussed the profitability of the Highline dealership. Specifically, during Galloway's deposition, counsel for Husker Auto asked Galloway a series of questions regarding various exhibits that showed Husker Auto's financial documents for a period before, during, and after Galloway's tenure. Some of those financial documents showed that in all but 3 months of 2018, the dealership experienced a net loss. For example, in December 2017, shortly after Galloway began her employment, the used car department had an adjusted gross income of $22,467 for the month. The documents showed that in December 2018, the used car department had an adjusted gross loss of $51,271 for the month. When asked about the dealership's financial statements during her tenure, Galloway agreed that the documents made it appear as though the financial situation had worsened, but she asserted that there were relevant aspects not accounted for in those figures. Specifically, she noted that during her tenure, the number of days a vehicle sat on the lot had decreased.

Although he did not have knowledge of Galloway's performance specifically, Zimmerman testified that the Highline dealership was "bleeding money." Likewise, Kurtz testified that the dealership was "in the red, at a loss, month after month after month." Burns testified that he had not seen any improvement in the gross profits of the used car portion of the dealership since Galloway started, but that because of his pending retirement, he opted to encourage Galloway, rather than fire her.

(e) NEOC Determination

Ultimately, the NEOC dismissed Galloway's charge with an official conclusion of "no reasonable cause." An attachment to the decision explained that the NEOC had determined

Galloway had not engaged in protected activity simply by reporting a coworker; it was, instead, necessary for her to have reported the activity of her employer to qualify for a claim under the NFEPA. The NEOC further stated that even if Galloway had engaged in protected activity, there was no evidence that the individual who terminated her employment (Kurtz) was aware of her protected activity, indicating that her termination had been nondiscriminatory.

### 3. District Court Suit

After receiving the unfavorable determination by the NEOC, Galloway filed suit in the district court for Lancaster County, Nebraska, alleging one claim of retaliation in violation of the NFEPA and one claim of wrongful discharge under the public policy exception to the at-will employment rule. The district court granted summary judgment in favor of Husker Auto for the same reasons as those announced in the NEOC determination.

### 4. Appeals

Galloway promptly filed an appeal. Husker Auto subsequently filed a motion to amend the judgment to include a taxation of costs against Galloway, which the court granted. At that point, Galloway filed another appeal. The appeals were consolidated, and we moved the matter to our docket.[2]

### III. ASSIGNMENTS OF ERROR

Although Galloway's brief asserted 12 separate assignments of error, those assignments can be restated and consolidated as follows: The district court erred in granting Husker Auto's motion for summary judgment by finding that (1) Galloway had not engaged in protected activities, (2) the illegal acts Galloway uncovered were the acts of a coworker, (3) Husker Auto's allegedly illegal activities did not violate Nebraska public policy, and (4) Galloway had neither established a

---

[2] See Neb. Rev. Stat. § 24-1106 (Cum. Supp. 2022).

prima facie case under the NFEPA or public policy exception, nor established that Husker Auto's reasons for termination were pretextual.

## IV. STANDARD OF REVIEW

[1] An appellate court reviews rulings on a motion for summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.[3]

[2] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[4]

## V. ANALYSIS

Because this case comes to us on a motion for summary judgment, we begin by explaining the legal framework governing summary judgment, the NFEPA, and the public policy exception. We then consider the elements of Galloway's specific claims for wrongful discharge in violation of the NFEPA and of the public policy exception within that framework.

### 1. General Summary Judgment Framework

[3-5] Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[5] The party moving for summary judgment must make a prima facie case by producing enough evidence

---

[3] *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024).

[4] *Continental Resources v. Fair*, 317 Neb. 391, 10 N.W.3d 510 (2024).

[5] *Ronnfeldt Farms, supra* note 3.

to show the movant would be entitled to judgment if the evidence were uncontroverted at trial.[6] If the burden of proof at trial would be on the nonmoving party, then the party moving for summary judgment may satisfy its prima facie burden either by citing to materials in the record that affirmatively negate an essential element of the nonmoving party's claim or by citing to materials in the record demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.[7] If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.[8] In the summary judgment context, a fact is material only if it would affect the outcome of the case.[9]

## 2. NFEPA and Public Policy Exception

Relating to Galloway's first claim, the NFEPA states, in relevant part, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his or her employees . . . because he or she . . . has opposed any practice or refused to carry out any action unlawful under federal laws or the laws of this state."[10]

In construing the NFEPA, we have explained that it is patterned after federal title VII of the Civil Rights Act of 1964, see 42 U.S.C. § 2000e (2018), and therefore, it is appropriate to look to federal court decisions construing title VII for guidance on how to interpret the NFEPA.[11] Accordingly, in cases involving claims of employment discrimination, this court

---

[6] *Id.*

[7] *Id.*

[8] *Id*.

[9] *Slama v. Slama*, 313 Neb. 836, 987 N.W.2d 257 (2023).

[10] § 48-1114(1).

[11] See *Knapp v. Ruser*, 297 Neb. 639, 901 N.W.2d 31 (2017).

has recognized the burden-shifting analysis that originated in *McDonnell Douglas Corp. v. Green*.[12]

[6,7] Under that analysis, the plaintiff, first, has the burden of proving by a preponderance of the evidence a prima facie case of discrimination.[13] Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection.[14] Third, should the defendant carry the burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.[15] At all times, the plaintiff in a retaliatory discharge action retains the ultimate burden of persuading the fact finder that he or she has been the victim of intentional impermissible conduct.[16]

[8] Regarding the first element in the burden-shifting framework, what is required to prove a prima facie case will vary depending on the claim.[17] We have explained that in order to show retaliation under the NFEPA, a plaintiff must establish (1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse action.[18]

[9] We have also stated that in establishing such a prima facie case, the harm, or the "practice" in § 48-1114(1)(c),

---

[12] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[13] *Haffke v. Signal 88*, 306 Neb. 625, 947 N.W.2d 103 (2020).

[14] *Id.*

[15] *Id.*

[16] *O'Brien v. Bellevue Public Schools*, 289 Neb. 637, 856 N.W.2d 731 (2014).

[17] *Knapp, supra* note 11 (applying analysis set forth in *McDonnell Douglas Corp., supra* note 12, to discrimination on basis of sex, using different elements than in wrongful discharge claim).

[18] *Baker-Heser v. State*, 309 Neb. 979, 963 N.W.2d 59 (2021).

refers to an unlawful practice of an employer.[19] In other words, the NFEPA does not protect an employee's opposition to the unlawful activities of fellow employees.[20]

As to Galloway's second claim, asserting wrongful discharge in contravention of public policy, the general rule in Nebraska is that an employer may terminate the employment of an at-will employee at any time. Our case law, however, has recognized that under the public policy exception to the at-will employment doctrine, an employee may claim damages for wrongful discharge when the motivation for the firing runs afoul of public policy.[21] There is no dispute that Galloway's employment was "at-will."

Regarding the specific elements of such a claim under the public policy exception, however, our analysis is identical to that used in an NFEPA claim. Accordingly, we need not discuss them separately, and the following discussion should be understood to encompass our rationale for both claims.

### 3. Record Shows Material Issues of Fact as to Both NFEPA and Public Policy Claims

Galloway maintains that there are genuine issues of material fact on both claims because she engaged in protected conduct by reporting Mathis' unlawful activity, which, as that of a top-level management employee acting within the scope of his employment, was synonymous with the conduct of Husker Auto as a whole. She argues that because "'there is no public policy more basic than the enforcement of a state's criminal code,'"[22] and because she believed Mathis' actions were unlawful, her reporting of his actions should have been protected activity.

---

[19] *Id.*

[20] *Id.*

[21] See *Trosper v. Bag 'N Save*, 273 Neb. 855, 734 N.W.2d 704 (2007).

[22] Brief for appellant at 33 (quoting *Schriner v. Meginnis Ford Co.*, 228 Neb. 85, 421 N.W.2d 755 (1988)).

In response, Husker Auto asserts that because Mathis was merely Galloway's coworker and not her employer, as required by the NFEPA and the public policy exception, there is no valid claim, regardless of whether Mathis was acting within the scope of his employment when he entered into sales contracts on behalf of Husker Auto.

At a broad level, all the parties' arguments on appeal deal with the question of whether there was any employer involvement in the alleged scheme. To the extent the parties have different views on this, we agree with Galloway and find that there are genuine issues of material fact regarding (1) whether Husker Auto was involved in or knew of the allegedly unlawful scheme and (2) whether Husker Auto knew that Galloway had been involved in any sort of investigation regarding the alleged scheme. Our reasoning for this conclusion is explained below.

(a) Genuine Issue of Material Fact Regarding
Husker Auto's Involvement
in Alleged Scheme

Husker Auto's level of knowledge or involvement is relevant because it goes to the larger question of whether an "employer," in the sense contemplated by the NFEPA and the public policy exception, conducted the unlawful practice. As previously mentioned, the district court agreed with Husker Auto's argument that there was no genuine issue of material fact because the alleged scheme involved only the actions of an employee, namely Mathis, and, therefore, Husker Auto, itself, was not involved. Our review of the record, however, shows that Galloway presented evidence to the contrary, and accordingly, we cannot conclude that there was no genuine issue of material fact. Specifically, Galloway presented evidence supporting the proposition that all of Husker Auto's management employees (including Muncrief and upper management) knew of the ongoing fraudulent activities conducted by Mathis.

Galloway testified that at the latest, upper management would have learned of Mathis' scheme during the above-mentioned meeting where Burns shared the folder containing the findings from Galloway's investigation. Galloway testified that she personally witnessed this meeting and observed the transfer of her investigative materials.

Galloway suggests, however, that upper management knew of the scheme even prior to this because, as Galloway testified, before giving the results of her investigation to Burns, she had a conversation with Brandie Schmidt, the controller for the dealership. In that conversation, Schmidt allegedly told Galloway that Kurtz was aware of the scheme and that Kurtz, specifically, was interested in seeing any evidence Galloway located. Galloway further testified that Muncrief knew of and was involved in the scheme, because "[Mathis] would give [Muncrief] the deals" and "[Muncrief] asked me a lot of questions about the deals."

Galloway's assertions of knowledge on the part of Husker Auto are also supported by the testimony of Patricia Pena, the dealership's compliance manager. Pena stated, "[W]e knew it was happening," referring collectively to the knowledge of those in management, the "ladies up in the office," and the salespersons of Husker Auto. Pena also estimated that there must have been at least 10 fraudulent sales of Mercedes-Benz vehicles per month, which were "way more" than the dealership had been producing. This contributed to Pena's conclusion that upper management knew of this scheme, because it would have actively benefited from the scheme financially.

Galloway's perspective was further corroborated by the testimony of Alyssabeth MeKiney, a member of the public who both functioned as and recruited other straw purchasers for Mathis' scheme. MeKiney explained that she would occasionally visit the dealership during "normal business hours" to prepare the Mercedes-Benz vehicles to be moved off the lot. Further, Kurtz admitted that in the summer or fall of 2018, he had met with an investigator employed by the State of

Nebraska who was inquiring into "why there were so many sales [involving] in-state customers that were not paying their sales tax on their car."

Insofar as the above facts indicate that the alleged scheme could have involved more than simply the acts of a coworker, we find that there are genuine issues of material fact, and therefore, summary judgment was not warranted. This determination does not, however, conclusively decide whether Galloway complained of unlawful activity on the part of Husker Auto; we leave that question, if relevant, to be considered on remand.

### (b) Dispute Regarding Knowledge of Galloway's Role in Investigation

Husker Auto's knowledge of Galloway's role in the investigation is also important, because it is relevant both on the matter of employer involvement and in determining if Galloway was, in fact, fired because she investigated and reported the scheme. There was specific testimony on behalf of Husker Auto that at the time of Galloway's termination, it did not know she had been involved in the investigation, and that her firing was based solely on her poor performance. The district court agreed. We find, however, that Galloway presented evidence and testimony that contradict this conclusion, such that summary judgment was improper.

Galloway testified that not only did upper management know of the scheme, but also that they knew, particularly, that she had investigated the scheme. Specifically, Galloway stated, "[Y]es, I know that . . . Zimmerman, and I know that . . . Kurtz[,] knew I was the one that gave the information to them, based off the conversations that . . . Burns and I had." Galloway asserts that Burns asked her to investigate the alleged scheme despite her better judgment that doing so would get her fired. In fact, Burns admitted that Galloway had expressed such a sentiment to him. However, according to Galloway, Burns nevertheless proceeded not only to share Galloway's findings

with upper management, but also to tell upper management that Galloway had conducted this investigation. Galloway's conversation with Burns regarding his sharing of the information with upper management allegedly occurred immediately after Burns' meeting with upper management.

On this point, there is also testimony from Galloway regarding alleged conversations with Schmidt, the controller, in which Galloway confided that she suspected she would be fired for conducting such an investigation. According to Galloway, it was also during these conversations that Schmidt told Galloway that Kurtz knew of her involvement.

Galloway also testified that when Burns shared her findings with upper management, each document would have contained the indicator "Galloway RFP 0162," making her involvement clear and known.

It is this knowledge of her investigation, Galloway argues, which led to her termination of employment, and she asserts that any argument to the contrary is mere pretext. Galloway testified that no one at Husker Auto had ever expressed any dissatisfaction with her work such that there would be any reason to fire her. In fact, she testified:

> Burns, my direct boss, was telling me, how good of a job I was doing . . . and to keep up the good work, and never once . . . was there a time where he told me that I was going to be . . . written up . . . for my performance . . . . He wished he had 10 of me. I was his workhorse . . . .

Pena, the compliance manager, testified to the same effect, saying that she had never heard or known of anyone criticizing Galloway's performance. Any criticism Pena had ever heard had been directed at the various departments generally, rather than individuals specifically. However, Pena was under the impression that Galloway's department was "doing much better when [Galloway] came, and things were running more smoothly." She added, "[I]t was all positive, from what I remember."

Further supporting Galloway's contention is the testimony of Zimmerman stating that he had never seen any written email, memorandum, or document criticizing Galloway's performance or indicating that she would or should be fired. Kurtz testified that although he had monthly discussions with Burns about the financial condition of the dealership, he had never instructed Burns to discipline Galloway, to decrease her compensation, or to place her on probation or suspension.

These facts are inconsistent with both the proposition that Husker Auto was not aware of Galloway's investigation and with the proposition that she was fired only for her poor performance. To that extent, we cannot conclude that there is no genuine issue of material fact.

## VI. CONCLUSION

Viewing the evidence in the light most favorable to Galloway and giving her the benefit of all reasonable inferences from the evidence, we determine that the record presents conflicting testimony and evidence regarding Husker Auto's involvement in the alleged scheme and regarding its knowledge of Galloway's investigation. As such, the district court erred in granting summary judgment in favor of Husker Auto. Accordingly, we reverse the judgment of the district court and remand the cause for further proceedings.

Reversed and remanded for
further proceedings.

Heavican, C.J., not participating in the decision.