Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/10/2025 09:10 AM CST

IN RE CHARLES AND PATRICIA MASEK FAMILY TRUST.
BARRY MASEK, INDIVIDUALLY AND AS ADMINISTRATOR OF
THE ESTATE OF PATRICIA MASEK, DECEASED, APPELLEE AND
CROSS-APPELLANT, AND COLLEEN EAMES, APPELLEE, V.
MARK MASEK AND DIANNE YAHIRO, APPELLANTS
AND CROSS-APPELLEES.

___ N.W.3d ___

Filed January 10, 2025.    No. S-23-856.

1. **Judgments: Appeal and Error.** The construction of a mandate issued by an appellate court presents a question of law on which an appellate court is obligated to reach a conclusion independent of the determination reached by the court below.

2. **Trusts: Equity: Appeal and Error.** Trust administration matters are reviewed for error appearing on the record, absent an equity question or question of law, which are instead reviewed de novo.

3. **Judgments: Appeal and Error.** For errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

4. **Judgments: Questions of Law: Claim Preclusion: Issue Preclusion: Appeal and Error.** The applicability of claim and issue preclusion is a question of law. On a question of law, an appellate court reaches a conclusion independent of the court below.

5. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

6. **Trial: Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.

7. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court reviews for

clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds.

8. **Attorney Fees.** When an attorney fee is authorized by statute or a uniform practice and procedure, the amount of the fee is addressed to the discretion of the trial court.

9. ____. Whether a statute or a uniform course of procedure authorizes attorney fees presents a question of law.

10. **Appeal and Error.** A notice of appeal from a nonappealable order does not render void for lack of jurisdiction acts of the trial court taken in the interval between the filing of the notice and the dismissal of the appeal by the appellate court.

11. **Evidence: Words and Phrases.** Competent evidence is evidence that is admissible and tends to establish a fact in issue.

12. **Trial: Evidence: Proof.** Where a party has shown that competent evidence exists to support his or her burden of proof, and competent evidence to the contrary has been produced, or different conclusions or inferences may reasonably be drawn from the evidence, it is then exclusively the province of the fact finder to determine the weight of the evidence and judge the credibility of witnesses.

13. **Actions: Appeal and Error.** Law of the case is a procedural doctrine that bars reconsideration of the same or similar issues at successive stages of the same suit or prosecution. The doctrine reflects the principle that an issue litigated and terminally decided in one stage of a case should not be later resuscitated at a later stage.

14. **Appeal and Error.** Under the law-of-the-case doctrine, the holdings of an appellate court on questions presented to it for review become the law of the case. Thereafter, unless the facts presented on remand are shown by the petitioner to be materially and substantially different, the appellate court's holdings conclusively settle all matters ruled upon, either expressly or by necessary implication.

15. **Estoppel.** Judicial estoppel is to be applied with caution so as to avoid impinging on the truth-seeking function of the court, because the doctrine precludes a contradictory position without examining the truth of either statement.

16. **Appeal and Error: Words and Phrases.** In appellate procedure, a "remand" is an appellate court's order returning a proceeding to the court from which the appeal originated for further action in accordance with the remanding order.

17. **Courts: Appeal and Error.** When a lower court is given specific instructions on remand, it must comply with the specific instructions and has no discretion to deviate from the mandate.

18. **Judgments: Courts: Appeal and Error.** When the judgment of a trial
court is reversed on appeal and the cause remanded without specific
instructions, it is the duty of the trial court to exercise its discretion in
the further disposition of the case.

Appeal from the County Court for Gage County, Steven B.
Timm, Judge. Affirmed as modified.

Matt Catlett, of Law Office of Matt Catlett, for appellants.

Douglas W. Ruge II for appellee Barry Masek.

William E. Seidler, Jr., of Seidler & Seidler, P.C., for appel-
lee Colleen Eames.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke,
Papik, and Freudenberg, JJ.

Papik, J.

This trust administration matter returns to this court after
proceedings on remand. Barry Masek, a contingent beneficiary
and successor cotrustee of an irrevocable family trust, alleged
in the initial proceedings that his siblings Mark Masek and
Dianne Yahiro, who were also contingent beneficiaries and
successor cotrustees, had breached the trust. Barry asserted
that Mark and Dianne had blocked access to the siblings'
mother, Patricia Masek, who was settlor, beneficiary, and
trustee, and that Mark and Dianne misused trust assets for
their own benefit. Patricia later died, and the county court ulti-
mately entered a money judgment against Mark and Dianne in
favor of Barry and overruled Mark and Dianne's motion for
new trial.

Mark and Dianne appealed the denial of their motion for
new trial. Because the county court's judgment did not state
the legal basis for finding Mark and Dianne liable for breach
of trust, we reversed the decision and remanded the cause
for further proceedings. See *In re Masek Family Trust*, 312
Neb. 94, 977 N.W.2d 919 (2022). On remand, the county
court received additional evidence and determined that "Mark

and Dianne are liable to the trust by participating in a breach of trust committed by Patricia or, more likely, by inducing Patricia to commit breach while she was in their care and control." The county court essentially issued the same judgment it had issued previously. Mark and Dianne now appeal, and Barry cross-appeals. Mark and Dianne mainly claim that the evidence does not support the judgment. We conclude that the evidence supports the judgment with respect to some expenditures, but not others, and we modify the language that awarded judgment in favor of Barry. We otherwise reject the remaining arguments. Therefore, we affirm, as modified.

## I. BACKGROUND

### 1. Masek Family Trust

Charles Masek and his wife, Patricia, created a family trust in 1993. At that time, they had five living children: Barry, Mark, Dianne, Colleen Eames, and Richard Masek. The trust named Charles and Patricia cotrustees. Under the terms of the trust, when Charles died in 2000, Patricia became sole trustee and the trust became irrevocable. The trust allowed the trustee to distribute trust assets for specified reasons, including the trustee's "care, maintenance, comfort, and enjoyment" as the trustee "deems advisable" and "medical expense, support and maintenance of [the] surviving spouse" "as may be necessary." The trust provided that upon Patricia's death, all assets would eventually be distributed to the children according to the terms of the trust. As amended, the trust named all five children as successor cotrustees. The trust further included terms to disqualify a trustee due to disability.

### 2. Barry Alleges Breach of Trust

Around 2014, Barry, Mark, Dianne, and Colleen agreed that Patricia, born in 1935, should no longer reside independently. Patricia was living in Nebraska with Richard, an adult with disabilities. Mark and Dianne moved Patricia and Richard to Illinois to live with Dianne. Much litigation ensued in Illinois and Nebraska.

Relevant here, in 2020, Barry initiated trust administration proceedings in the county court against Mark and Dianne. Barry sought damages and other relief. He alleged Patricia had cognitive impairments and was not capable of managing trust assets or acting as trustee. According to Barry, Mark and Dianne had blocked access to Patricia and trust records and had used trust assets for themselves. He also alleged that Mark and Dianne had "amended the [t]rust" to appoint one or both of them trustees. Barry claimed that pursuant to the Nebraska Uniform Trust Code, Mark and Dianne should be removed as trustees and be ordered to pay damages for breach of trust. See Neb. Rev. Stat. §§ 30-3890 and 30-3891 (Reissue 2016).

### 3. Initial Evidentiary Hearing

In September 2020, the county court conducted an evidentiary hearing on Barry's pleading; Mark and Dianne did not appear. The county court received exhibits and heard testimony by Barry. We summarize that evidence in more detail in the analysis section below.

### 4. Initial County Court Order

In October 2020, the county court entered a default judgment. The county court entered judgment of $1,276,858 against Mark and Dianne, plus costs, "in favor of . . . Barry . . . as Guardian and Conservator for Patricia . . . , Trustee and Beneficiary of the Charles and Patricia Masek Family Trust." The county court also awarded attorney fees to Barry in the same capacity, in the amount of $10,306.25. The county court denied Barry's other requests for relief, indicating in its findings that Mark and Dianne were not trustees.

### 5. Patricia Dies; Motion for New Trial Overruled

Mark and Dianne moved for new trial. In part, they alleged that the county court's decision was not sustained by sufficient evidence pursuant to Neb. Rev. Stat. § 25-1142(6) (Reissue 2016).

Thereafter, Patricia died. Upon Barry's motion, the county court revived the judgment "in [Barry's] name as Administrator and Representative for the Estate of Patricia . . . , deceased."

The county court next overruled Mark and Dianne's motion for new trial, finding that Mark and Dianne had failed to establish statutory grounds for new trial.

## 6. Reversal and Remand on Appeal

Mark and Dianne appealed from the order overruling their motion for new trial. They contended, among other things, that (1) the county court issued a judgment contrary to its own findings; (2) "the county court erred in entering judgment in favor of Barry as guardian and conservator of Patricia because the trust itself would be entitled to judgment"; and (3) "the county court's judgment was not sustained by the evidence because the evidence 'concerned only Patricia's personal funds, not Trust funds.'" See *In re Masek Family Trust*, 312 Neb. 94, 104, 977 N.W.2d 919, 926 (2022), citing brief for appellants in case No. S-21-552.

We considered every contention Mark and Dianne raised and wholly rejected all but one: that the county court issued a judgment contrary to its own findings by ruling that Mark and Dianne were liable for breach of trust, while also finding that Mark and Dianne were not trustees. We concluded that we could not resolve whether the judgment was sustained by sufficient evidence for purposes of § 25-1142(6), because the county court did not identify a legal theory of liability.

Our analysis recognized two possible legal theories under which Mark and Dianne could be held liable to the trust: (1) as de facto trustees or (2) as beneficiaries who participated in a breach of trust committed by the trustee, by, for example, inducing the trustee to commit breach. As to the second theory, we found instructive the analytical framework of the Restatement (Third) of Trusts § 104 (2012). We concluded:

> [W]e reverse, and remand to the county court for further
> proceedings consistent with this opinion, including, but

not limited to, conducting a hearing wherein the parties would have the opportunity to present evidence or arguments concerning [Mark and Dianne's] liability to the trust either as de facto trustees or by participating in a breach of trust committed by Patricia, or by inducing Patricia to commit breach while she was in their care and control.

*In re Masek Family Trust*, 312 Neb. at 107, 977 N.W.2d at 928.

### 7. Hearing on Remand

At the hearing on remand, Barry, Mark, Dianne, and Colleen testified. The county court received the testimony and exhibits produced at the previous hearing, in addition to other exhibits. The analysis section below recounts the relevant evidence presented on remand.

### 8. County Court's Order on Remand

Following the hearing on remand, the county court issued what it styled as an order. The county court expressly found Dianne's testimony to be the least credible. As for Colleen's positions, the county court deemed them to be consistently in the trust's best interests. And it found the testimonies of Barry and Mark to "fall somewhere between the two."

Considering the evidence from both hearings, the county court made factual findings and determined that "Mark and Dianne are liable to the trust by participating in a breach of trust committed by Patricia or, more likely, by inducing Patricia to commit breach while she was in their care and control." The county court further found, "Because of Patricia's diminished capacity the Court does not believe that she knowingly committed a breach of the trust."

The county court again entered judgment against Mark and Dianne in the amount of $1,276,858 plus costs, this time in favor of Barry "as executor of the Estate of Patricia Masek, trustee and beneficiary of the Charles and Patricia

Masek Family Trust." It again awarded Barry attorney fees of $10,306.25. The county court ordered, "[T]his court shall retain jurisdiction to hold a hearing on additional requested attorney fees" in late September 2023.

### 9. Attorney Fees, Notices of Appeal, and Cross-Appeal

Prior to the hearing on additional requested attorney fees, Mark and Dianne filed a notice of appeal. Barry thereafter moved for summary dismissal, asserting there was no final order because the county court had not ruled on the matter of additional attorney fees.

While Barry's motion for summary dismissal was still pending, the county court conducted the hearing on additional attorney fees and received evidence, as described in our analysis below. The county court awarded Barry additional attorney fees for the period following our mandate in *In re Masek Family Trust*, 312 Neb. 94, 977 N.W.2d 919 (2022).

Mark and Dianne again filed a notice of appeal, which our clerk docketed as the present appeal. This court dismissed the earlier appeal for lack of jurisdiction, pursuant to Neb. Ct. R. App. P. § 2-107(B)(1) (rev. 2022).

## II. ASSIGNMENTS OF ERROR

Mark and Dianne assign, rephrased, that the county court erred in (1) imposing liability against Mark and Dianne; (2) making certain evidentiary rulings; (3) entering judgment "'in favor of Barry . . . as executor of the Estate of Patricia Masek, trustee and beneficiary of the Charles and Patricia Masek Family Trust'"; and (4) awarding "additional attorney fees" to Barry.

On cross-appeal, Barry assigns that to the extent the county court's order considered whether there was sufficient evidence to support the underlying judgment, it erred. Barry's cross-appeal also assigns that we lack appellate jurisdiction.

## III. STANDARD OF REVIEW

[1] The construction of a mandate issued by an appellate court presents a question of law on which an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *Darling Ingredients v. City of Bellevue*, 313 Neb. 853, 986 N.W.2d 757 (2023).

[2,3] Trust administration matters are reviewed for error appearing on the record, absent an equity question or question of law, which are instead reviewed de novo. *In re Masek Family Trust, supra*. For errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

[4] The applicability of claim and issue preclusion is a question of law. On a question of law, we reach a conclusion independent of the court below. *Boone River, LLC v. Miles*, 314 Neb. 889, 994 N.W.2d 35 (2023), *modified on denial of rehearing* 315 Neb. 413, 996 N.W.2d 629.

[5-7] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020). A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *Id.* Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds. *Id.*

[8,9] When an attorney fee is authorized by statute or a uniform practice and procedure, the amount of the fee is addressed to the discretion of the trial court. *BCL Properties v. Boyle*, 314 Neb. 607, 992 N.W.2d 440 (2023). However,

whether a statute or a uniform course of procedure authorizes attorney fees presents a question of law. *Id.*

## IV. ANALYSIS

### 1. JURISDICTION

[10] Before addressing the merits, we consider Barry's argument that this court lacks jurisdiction over Mark and Dianne's appeal. We understand Barry to argue that after the premature appeal was filed, the county court was divested of jurisdiction such that no additional appeal could be perfected. We have explained, however, that a notice of appeal from a nonappealable order does not render void for lack of jurisdiction acts of the trial court taken in the interval between the filing of the notice and the dismissal of the appeal by the appellate court. See *Murray v. Stine*, 291 Neb. 125, 864 N.W.2d 386 (2015). Therefore, Mark and Dianne's premature appeal had no effect on whether they could file the present appeal.

### 2. BENEFICIARY LIABILITY

Because we have jurisdiction, we can examine the merits of the county court's judgment, which was based on the theory that Mark and Dianne were liable to the trust as beneficiaries. Mark and Dianne claim that the judgment was in error. No party contends that whether a beneficiary is liable for breach of trust presents an equity question. Instead, the parties' arguments, Mark and Dianne's especially, assume review for errors on the record, because they primarily dispute whether the county court's judgment was supported by competent evidence. See *In re Masek Family Trust*, 312 Neb. 94, 977 N.W.2d 919 (2022) (for errors appearing on record, inquiry is whether decision conforms to law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable). We follow the parties' lead and review the county court's judgment for errors on the record by considering whether it was supported by competent evidence.

[11,12] Competent evidence is evidence that is admissible and tends to establish a fact in issue. *In re Estate of Walker*, 315 Neb. 510, 997 N.W.2d 595 (2023). Where a party has shown that competent evidence exists to support his or her burden of proof, and competent evidence to the contrary has been produced, or different conclusions or inferences may reasonably be drawn from the evidence, it is then exclusively the province of the fact finder to determine the weight of the evidence and judge the credibility of witnesses. *Id.* As we will explain, ultimately, we find that competent evidence supported the district court's conclusion that some, but not all, of the expenditures upon which the judgment was based were breaches of the trust.

### (a) Theory of Liability

As described above, our opinion in *In re Masek Family Trust, supra*, identified the Restatement (Third) of Trusts § 104 (2012) as a possible legal basis for finding Mark and Dianne liable to the trust. The Restatement, *supra*, § 104(1) at 90, provides that "[a] beneficiary is not personally liable to the trust except to the extent . . . the trust suffered a loss resulting from a breach of trust in which the beneficiary participated." This was the theory of liability that the county court implemented in its order on remand when it found that "Mark and Dianne are liable to the trust by participating in a breach of trust committed by Patricia or, more likely, by inducing Patricia to commit breach while she was in their care and control." On appeal, Mark and Dianne do not claim that the county court applied the wrong theory of liability to the circumstances in this case, so we do not address that question. Instead, Mark and Dianne claim that there was insufficient evidence to support the county court's decision under the theory it identified. We discuss the parties' arguments related to that point below in the context of the Restatement's legal framework.

But first, we address the burden of proof. At issue in this case is whether there was sufficient evidence that Mark and

Dianne participated in a breach of trust by Patricia, who was then the sole trustee. The Restatement, *supra*, § 100, comment *f*. at 68, specifically sets forth the burden of proof to show a breach of trust by a trustee: "When a plaintiff brings suit against a trustee for breach of trust, the plaintiff generally bears the burden of proof." We have recognized this as a general principle of trust law, see *In re Estate of Graham*, 301 Neb. 594, 919 N.W.2d 714 (2018), and the parties have not given us any compelling reason to apply a different burden of proof. Therefore, in the sections that follow, we analyze whether Barry carried his burden of proof on his claim that Mark and Dianne, as beneficiaries, are liable for breach of trust.

### (b) Nature of Funds at Issue

Before discussing whether Mark's and Dianne's actions support beneficiary liability, one preliminary issue we must take up is the nature of the funds that make up the judgment. In opposing the county court's decision, Mark and Dianne dispute the nature of the funds that make up the judgment. They characterize them as Patricia's personal assets, not trust assets, such that there could be no breach of the trust causing a loss to the trust under the county court's theory of liability. As we will explain, Mark and Dianne give us no reason to overturn the county court's finding that the funds at issue were trust assets.

### (i) Background

By way of background, Barry testified about the nature of the disputed assets at the initial hearing. Barry, a certified public accountant, recalled that when Charles died, all of Patricia's "liquid assets," then held in an Edward Jones account in Nebraska, went into the family trust. Barry later learned that around 2015, Patricia's Edward Jones account was transferred from Nebraska to Illinois. Barry also testified that he obtained information about Patricia's financial situation from Chase Bank (Chase) in Illinois. Barry testified that the funds at both Chase and Edward Jones were "administered

under the family trust" for Patricia's benefit. According to Barry, these were Patricia's "only financial asset accounts that she had."

The county court's initial judgment found that "all monetary assets were put into the . . . Family Trust" and that "[t]hese assets included bank accounts and an Edward Jones account." Consistent with Barry's testimony and exhibits focusing on funds from the Chase account, the county court further found that beginning in 2015, Mark and Dianne exercised control over the family trust accounts, and that a total of $1,276,858 was taken out of these accounts.

In the initial appeal, we rejected Mark and Dianne's argument that "the county court's judgment was not sustained by the evidence because the evidence 'concerned only Patricia's personal funds, not Trust funds.'" See *In re Masek Family Trust*, 312 Neb. 94, 104, 977 N.W.2d 919, 926 (2022), citing brief for appellants in case No. S-21-552.

Regarding whether the Chase account consisted of trust assets or Patricia's personal assets, Mark and Dianne presented evidence on remand that after the initial hearing, Barry, as "[p]lenary [g]uardian" of Patricia's estate and person, filed a pleading in Illinois to recover against Mark and Dianne on theories of financial exploitation, conversion, breach of fiduciary duty, civil conspiracy, and punitive damages. That pleading identified expenditures from the Chase account upon which the present judgment was based as "Patricia's assets" and sought to recover those assets. In his testimony on remand, Barry admitted that he filed the pleading in an Illinois court after the previous hearing. He also testified that the funds referenced in that pleading were the trust funds and that he did not draft the pleading—his Illinois attorney did, and Barry was not familiar with it.

Barry also acknowledged on remand that he was not very familiar with the terms of the family trust, not having read it for at least 10 years. And he testified that he did not know whether the Chase account was owned by the family trust. But

when asked whether the funds in the Chase and Edward Jones accounts were originally funds in the account for the trust, Barry answered, over Mark and Dianne's objection, "All I can tell you is that they were [Patricia's] accounts here in Beatrice, Nebraska. And then they were—ended up at Chase . . . and Edward Jones in Illinois." Barry later recalled his testimony before remand that he was able to trace the original trust funds, and he agreed that there was "no doubt in [his] mind" that the funds in the Chase and Edward Jones accounts were trust funds.

The county court's order on remand rejected Mark and Dianne's argument that the assets in the Chase account were not trust assets. It explained that our initial opinion found this contention lacked merit and that evidence at the hearing on remand did not support a different conclusion.

### (ii) Analysis

[13,14] In declining to treat the Chase account assets as Patricia's personal assets rather than trust assets, the county court's order on remand tacitly recognized the doctrine of law of the case. Law of the case is a procedural doctrine that bars reconsideration of the same or similar issues at successive stages of the same suit or prosecution. *Tierney v. Tierney*, 309 Neb. 310, 959 N.W.2d 556 (2021). The doctrine reflects the principle that an issue litigated and terminally decided in one stage of a case should not be resuscitated at a later stage. See *id.* Under the law-of-the-case doctrine, the holdings of an appellate court on questions presented to it for review become the law of the case. *Id.* Thereafter, unless the facts presented on remand are shown by the petitioner to be materially and substantially different, the appellate court's holdings conclusively settle all matters ruled upon, either expressly or by necessary implication. *Id.*

Mark and Dianne do not quarrel with the county court's observation that our initial opinion found no merit to their argument that the disputed expenditures came from Patricia's

personal assets and not trust assets, and they do not challenge the notion that our holding on the matter became law of the case. But Mark and Dianne seem to suggest, as they did at trial, that it did not remain so, because they presented materially and substantially different facts on remand in the form of Barry's Illinois pleading seeking to recover the disputed funds as assets of Patricia's personal estate.

Even if the law-of-the-case exception was sufficiently raised by Mark and Dianne on appeal, we need not decide whether it applies such that the county court was permitted to reach a different conclusion regarding the nature of the disputed funds. This is because even if the exception applied, competent evidence on remand supported the county court's finding that the funds in the Chase account were assets of the family trust: Barry testified on remand that they were trust assets, and the county court could, and apparently did, credit that testimony. See *In re Estate of Walker*, 315 Neb. 510, 997 N.W.2d 595 (2023). Mark and Dianne cite other evidence to argue that the funds in the Chase account were not trust funds, but in our review for errors on the record, Barry's testimony to the contrary is sufficient to support the county court's ruling. See *In re Masek Family Trust*, 312 Neb. 94, 977 N.W.2d 919 (2022). See, also, *In re Estate of Walker, supra* (where competent evidence supports different conclusions or inferences, it is exclusive province of fact finder to determine weight of evidence and judge credibility of witnesses).

More explicitly, Mark and Dianne submit on appeal that on remand, the county court should not have considered Barry's testimony on the issue at all. As they did in the county court, Mark and Dianne contend that the Illinois pleading barred Barry from testifying on remand that trust assets were the source of the funds for the disputed expenditures. They cite authority that a party may neither "blow hot and cold" with reference the same transaction," see *Ellis v. Omaha Cold Storage Co.*, 122 Neb. 567, 575, 240 N.W. 760, 763 (1932) (internal quotation marks omitted), nor "recite upon oath one

statement of facts in one judicial proceeding and then, to meet the exigencies of the occasion in the trial of a different suit, recite under oath an entirely different story," see *Gohlinghorst v. Ruess*, 146 Neb. 470, 473, 20 N.W.2d 381, 383 (1945). Although Mark and Dianne do not pinpoint a legal theory, their argument is reminiscent of judicial estoppel.

Judicial estoppel is an equitable doctrine that a court invokes at its discretion to protect the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding. See *Becher v. Becher*, 311 Neb. 1, 970 N.W.2d 472 (2022). An appellate court reviews a court's application of judicial estoppel to the facts of a case for abuse of discretion. See *id.*

With this rubric in mind, we understand Mark and Dianne to suggest that the county court abused its discretion when it did not apply the doctrine of judicial estoppel to Barry's testimony on remand that the disputed expenditures were made up of trust assets. We ascertain no abuse of discretion.

[15] For one thing, the doctrine of judicial estoppel prevents a party from taking a position inconsistent with one it successfully asserted in a prior proceeding, see *id.*; and our record does not disclose whether Barry's representations in the Illinois court met with success. Moreover, judicial estoppel is to be applied with caution so as to avoid impinging on the truth-seeking function of the court, because the doctrine precludes a contradictory position without examining the truth of either statement. *Id.* We have held that before a court may apply the judicial estoppel doctrine, "bad faith or an actual intent to mislead on the part of the party asserting inconsistent positions must be demonstrated." See *Cleaver-Brooks, Inc. v. Twin City Fire Ins. Co.*, 291 Neb. 278, 289, 865 N.W.2d 105, 114-15 (2015). Yet even when such a showing is made, the trial court retains discretion to decide whether to apply the doctrine. See *id.* Indeed, it is the trial court that is best equipped to resolve "'whether a litigant is playing fast and

loose with the courts,'" because the trial court has "'intimate knowledge of the case at bar'" and "'first-hand observations of the lawyers and their litigation strategies.'" See *Becher v. Becher*, 311 Neb. at 23, 970 N.W.2d at 490, quoting *Alternative System Concepts, Inc. v. Synopsys*, 374 F.3d 23 (1st Cir. 2004).

There is no conclusive showing that on remand, Barry acted in bad faith or had an actual intent to mislead the county court. Although it is perhaps arguable that Barry took inconsistent positions regarding the nature of the funds in the Chase account, we cannot conclude that the county court abused its discretion in considering his testimony on remand that those funds were trust assets.

### (c) Scope of Mandate

As we work toward analyzing whether competent evidence supports the theory of liability identified by the county court, another preliminary issue is the scope of our mandate. Barry proposes that our mandate allowed the county court to address the legal basis for liability on remand but not the amounts supporting the underlying judgment. He assigns on cross-appeal that to the extent the county court considered on remand whether there was evidence to support the judgment amount in its initial order, it erred. We are unconvinced, and we conclude that on remand, the county court acted within our mandate to the extent that it reassessed the amounts supporting the judgment.

[16-18] The controlling principles are well established. In appellate procedure, a "remand" is an appellate court's order returning a proceeding to the court from which the appeal originated for further action in accordance with the remanding order. *Darling Ingredients v. City of Bellevue*, 313 Neb. 853, 986 N.W.2d 757 (2023). When a lower court is given specific instructions on remand, it must comply with the specific instructions and has no discretion to deviate from the mandate. *Id.* When the judgment of a trial court is reversed on

appeal and the cause remanded without specific instructions, it is the duty of the trial court to exercise its discretion in the further disposition of the case. *Id*.

We do not read our mandate to preclude reconsideration of the judgment amount on remand. Our initial opinion reversed the order denying new trial and remanded the cause for further proceedings. We reasoned that because the county court did not provide a legal basis for liability, we could not decide whether the decision was sustained by sufficient evidence such that a new trial would be warranted. As stated above, we concluded:

> [W]e reverse, and remand to the county court for further proceedings consistent with this opinion, including, but not limited to, conducting a hearing wherein the parties would have the opportunity to present evidence or arguments concerning [Mark and Dianne's] liability to the trust either as de facto trustees or by participating in a breach of trust committed by Patricia, or by inducing Patricia to commit breach while she was in their care and control.

*In re Masek Family Trust*, 312 Neb. 94, 107, 977 N.W.2d 919, 928 (2022). Neither this language, nor our opinion as a whole, conveyed that the county court should not reconsider the amounts that made up the judgment. And it would be reasonable for the county court to analyze individual expenditures under a breach of trust theory of liability where the judgment is based upon multiple expenditures, each one alleged to be a breach of the trust. So, to the extent that the county court entertained challenges to the judgment amount, it did not venture beyond the scope of our mandate.

### (d) Timeframe

We next appraise the scope of evidence properly before us. We do so because Mark and Dianne claim that the county court erred by considering certain evidence. Specifically, they contend that on remand, the county court erred (1) in

receiving emails the siblings exchanged prior to a May 17, 2016, summary judgment entered by the county court in earlier trust proceedings and (2) in considering "*anything*" occurring on or prior to that summary judgment. Brief for appellants at 27 (emphasis in original). In essence, Mark and Dianne urge that evidence should have been limited to the timeframe after the 2016 summary judgment. We disagree.

Mark and Dianne's position centers on earlier county court proceedings to remove Patricia as trustee, initiated by Colleen in 2015. In those proceedings, Colleen cited the terms of the trust pertaining to removal for disability and asserted that Patricia was unable to administer the trust effectively. Colleen also asked the county court to remove all successor cotrustees and appoint a corporate fiduciary as successor trustee. Colleen requested this and "[s]uch other and further relief as the Court deems equitable and proper and necessary to protect The Trust property and the interests of the beneficiaries."

On May 17, 2016, the county court granted Patricia summary judgment in the trustee removal proceedings. It noted that "there is no allegation or evidence that Patricia is unwilling to serve or persistently failed to administrate the trust effectively, only that she is 'unfit' because of mental deficiency." The county court determined that the terms of the trust concerning removal for disability prevailed; that the terms of the trust required a written certificate by a physician in Patricia's state of residence to find Patricia "'disabled'"; and that those criteria were not met by Colleen's proffer of an examination of Patricia by a clinical psychologist who was neither a physician nor licensed to practice in Illinois, Patricia's state of residence. Consequently, Patricia remained trustee.

On remand, the county court received the siblings' emails over Mark and Dianne's relevancy objection. In their closing argument, Mark and Dianne also raised claim and issue preclusion, submitting that the emails and testimony "concerning pre-May 17, 2016, Patricia's memory and general mental

state" addressed the same "issue"—that "Patricia caused a loss to the Trust due to mental incapacity or otherwise." Their argument also stated that the disputed expenditures "did not start until June 2016, and so whether Patricia had sufficient mental capacity to administer the Trust in 2013 or 2014 or even 2015 has no bearing on whether she had sufficient capacity to administer the Trust once the [disputed expenditures] began." (Emphasis omitted.)

The county court's order on remand apparently rejected these arguments. The county court explained that although the emails could not have served as proof of disability under the terms of the trust in its May 2016 summary judgment, the county court was "not now so constrained." It went on to find that "as early as 2013 all of the parties were concerned about Patricia's ability to live and function independently" and that "[a]s time progressed her capacity deteriorated." The county court then made factual findings that "[a]s Patricia's mental and physical health declined, Mark and Dianne's dominion and control over the trust increased to the point that Patricia was merely a conduit for their actions" and that "[b]ecause of Patricia's diminished capacity the Court does not believe that she knowingly committed a breach of the trust." Now on appeal, Mark and Dianne claim that the county court erred in receiving the emails and in considering other evidence of events that preceded the May 2016 summary judgment, but their arguments are unavailing.

Mark and Dianne assert, without much explanation, that the county court erred in receiving the emails over their objection, because they were not relevant to whether Mark and Dianne participated in any breach of trust by Patricia or induced her to commit any breach by way of the disputed expenditures. We find no merit to this contention. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Neb. Rev. Stat. § 27-401 (Reissue 2016). At issue on remand was whether Mark and Dianne participated in a breach of trust by Patricia. The emails illustrated the continuum of Patricia's cognitive state both before and after the summary judgment and had a tendency to prove whether Patricia's actions involved Mark and Dianne, because the emails bore on whether Patricia was capable of planning and carrying out the disputed expenditures independently. This cleared the low bar of evidentiary relevance. See *In re Estate of Walker*, 315 Neb. 510, 997 N.W.2d 595 (2023).

Mark and Dianne also contend that the emails were erroneously received because "anything" that occurred prior to the summary judgment could not be relitigated due to "res judicata." Brief for appellants at 27 (emphasis omitted). We are unpersuaded that res judicata, long called claim preclusion by this court, barred consideration of the emails. See *Hara v. Reichert*, 287 Neb. 577, 843 N.W.2d 812 (2014).

Generally, claim preclusion bars the relitigation of a claim that has been directly addressed or necessarily included in a former adjudication. *Boone River, LLC v. Miles*, 314 Neb. 889, 994 N.W.2d 35 (2023), *modified on denial of rehearing* 315 Neb. 413, 996 N.W.2d 629. For claim preclusion to apply, our cases require the claim in the prior suit and the claim in the present suit to be based on the same cause of action. See *id*.

Again, the 2016 summary judgment addressed whether Colleen had brought sufficient proof to show that Patricia should be removed as trustee because she was "disabled" as the trust defined it. The county court's summary judgment determined that Colleen had not produced the specific type of proof that the terms of the trust required for removal of a trustee due to disability. This finding did not limit the county court on remand in the present matter, where the claim was that Mark and Dianne participated in breaches of trust by Patricia. As we have said, Patricia's cognitive state is relevant to that claim, and there is a difference between insufficient

proof of disability under the terms of the trust and a finding that Patricia breached the trust with participation by Mark and Dianne. The summary judgment ruling was not a declaration that Patricia was capable of being trustee; it was an explanation of why Colleen had not legally proved otherwise.

### (e) Participation in Breach of
### Trust Resulting in Loss

Having settled the preliminary issues above, we move on to examine Mark and Dianne's actions. Mark and Dianne posit that there was insufficient evidence underlying the county court's ruling on remand that they are "liable to the trust by participating in a breach of trust committed by Patricia or, more likely, by inducing Patricia to commit breach while she was in their care and control." The county court decided that Mark and Dianne had participated in several breaches of trust by Patricia based on the finding that they had "dominion and control over the trust [that] increased to the point that Patricia was merely a conduit for their actions." The county court awarded a total judgment consistent with the specific expenditures alleged by Barry to be breaches of trust. Mark and Dianne assert that the evidence was not sufficient to support the county court's decision: They argue that there was not evidence that they participated in the expenditures and that even if there were evidence they participated, the expenditures did not amount to breaches of the trust. Below, we analyze whether Mark and Dianne had control over the trust assets such that they could participate in breaches of trust as contemplated in the Restatement (Third) of Trusts (2012) and whether there were breaches of trust in the amounts found by the county court. Upon our review for errors on the record, we ultimately conclude that there was competent evidence that Mark and Dianne did exercise control over the trust assets and that the county court's judgment was supported by competent evidence for certain disputed expenditures, but not for others.

### (i) Participation

We first focus on Mark and Dianne's role in the disputed expenditures that they claim were made by Patricia or at her bidding. Mark and Dianne maintain that the county court erred in deciding they participated in or induced Patricia to commit any breach of trust under the Restatement's theory of beneficiary liability. See Restatement, *supra*, § 104. We reject this argument, and we conclude that there was competent evidence upon which to base a finding that Mark and Dianne had control over the trust assets, such that they could participate in a breach of the trust as contemplated in the Restatement. See *In re Masek Family Trust*, 312 Neb. 94, 977 N.W.2d 919 (2022).

As we have said, in our initial opinion, "we [found] the Restatement's analytical framework instructive for purposes of examining [Mark and Dianne's] actions in terms of the purported breaches of trust." *In re Masek Family Trust*, 312 Neb. at 106, 977 N.W.2d at 927. Again, that analytical framework states that a beneficiary is liable "to the extent . . . the trust suffered a loss resulting from a breach of trust in which the beneficiary participated." See Restatement, *supra*, § 104 at 90. Our initial opinion also recognized that the comments to the Restatement explain:

> Certainly, the beneficiary participates in a breach of trust if the beneficiary performs, or joins in performing, an act the beneficiary knows is a breach. . . . For example, a beneficiary has participated in a breach of trust if the beneficiary induced the misconduct knowing that it would or might be a breach of trust. However, mere knowledge of, or consent to, the breach, without more, is insufficient to constitute participation . . . .

*Id*., comment *f*. at 91. It is these principles we consider in evaluating the following facts.

Barry testified that in 2011 or 2012, Patricia "mentally wasn't as sharp as she used to be." From 2013 to 2015, Barry, Mark, Dianne, and Colleen exchanged emails describing their

impressions of Patricia's situation and cognitive state. Over the course of a year or two, Barry, Mark, Dianne, and Colleen discussed that at some point, Patricia would not be able to take care of herself and of Richard, who, Barry said, could "never live on his own."

In email messages exchanged among the siblings from July to August 2013, Mark and Dianne relayed their observations of Patricia's cognitive state. They provided multiple examples of Patrcia's forgetting something that she or someone else had just said or done. Dianne recounted an instance when Patricia "pressed on the doorknob because she didn't know what the doorbell was," even though Dianne had rung the doorbell moments before. Dianne's email also recalled a situation when Patricia "couldn't remember her address and made one up." Dianne reported that when Patricia paid a retailer with a check, she could not remember the date or where she was, so she left those two lines blank and gave the check to the cashier. During the same visit, Patricia could not find or recognize personal items that she used daily and could not remember how to lock her front door with her house key. Dianne further stated, "[Patricia] does not know how to add a tip to a credit card receipt as she . . . cannot do simple math."

Barry testified that after about 2 years of the siblings' discussing Patricia's situation, "[t]he decision was made" that Patricia and Richard should live in Downers Grove, Illinois, where Dianne lived with her family. According to Barry, Patricia and Richard were upset by the discussions about moving. Colleen did not agree with the decision to move Patricia and Richard to Illinois and wanted them to reside with her in Omaha, Nebraska. Barry recalled that as a result of this disagreement, "when they were moved to [Illinois] they stopped all communication with Colleen and her family."

Patricia moved to Illinois in February 2014. Barry recalled that Mark and Dianne picked up Patricia and Richard in Nebraska on the pretense of going out to lunch for Patricia's birthday and took them to Illinois, without allowing them to

say goodbye to anyone. Barry testified that although he had agreed that Patricia and Richard should live with Dianne, neither he nor Colleen was informed when the move occurred.

Documents from around the time of the move showed that Dianne was appointed to act under durable power of attorney for Patricia, replacing Colleen. Barry testified that he was not informed of this change. Barry described Patricia's mental capacity at the time of the move as "impaired"; he testified, "[S]he was forgetting things and repeating things."

In early June 2014, Mark said in an email that a friend of Patricia's in Nebraska expressed that she and other members of Patricia's "'card club'" had been concerned about Patricia because they "'saw that she was forgetting.'" Mark described another occasion when Patricia forgot something she had just said. He continued:

> I think that [Patricia] as I knew her is gone. For me, a different person is here. I agree with the doctors. In order to protect her mental stability, [Patricia] needs to stay away from her past living area. Confusion and disorientation are probable. And for her constant orientation, I want Dianne to accompany her at all times. She is in moderate to severe Alzheimer's. I hope that my prayers can slow it as she continues to vanish; I wish that it were different.

Also in early June 2014, Dianne stated in an email to Barry, Mark, and Colleen that "[a]ccording to a doctor's evaluation, [Patricia] is in the moderate to later stages of Alzheimer's. She has severe short term memory loss." Dianne wrote in the email, "Conversations with the staff at Edward Jones in Beatrice stated that they were happy that [Patricia] was living with me as they were noticing that she was slipping and that we did the right thing to move her." Dianne's email also relayed that Patricia had forgotten how to set the table and how to execute basic aspects of hygiene. According to Dianne's email, staying with her provided Patricia "stability and emotional continuity as she continues to decline with her disease."

Dianne also testified that after a few months in Illinois, Patricia had acclimated, her medication dose was changed, and her mental condition improved.

Dianne testified that after Patricia moved to Illinois in 2014, Dianne prepared meals for her; did her laundry; observed her hygiene, such as bathing and brushing her teeth; shopped for her food and clothing; helped with "memory workbooks"; and took her to appointments and to church. Dianne also testified that she "slept in the same room with her at night so that she was safe going to the bathroom in the middle of the night." This was a "safety precaution to ensure she didn't fall." Dianne testified that she helped Patricia in this way daily until early 2018.

Mark testified that Patricia wished to compensate Dianne and her husband for the in-home care. To facilitate this compensation, Mark, to whom Patricia had conveyed power of attorney for her property in 2016, created a reimbursement and compensation agreement to reflect Patricia's wishes and the rate of payment, which was based on rates charged by third-party caregivers. According to Mark, Patricia selected this rate from a range of daily rates he presented to her and it was 10 percent lower than the lowest rate. Mark created monthly invoices for Patricia to sign. The signed invoices were then sent back to Mark. Checks in evidence for the invoiced amounts appear to be signed by Patricia. Mark testified that he was involved in this process "for monitoring and oversight."

Meanwhile, Barry, who also lived in Illinois, frequently saw Patricia and Richard for a time after they moved there. Barry recalled that from 2013 to 2015, Patricia's "dementia continued to get worse." He described that although Patricia recognized and enjoyed her family, she was "not remembering things." She could not order at a restaurant because she could not read the menu or pay for things. He testified, "[D]ay-to-day functions in that regard were becoming . . . very difficult."

In 2015, Barry invited Colleen and her family to his house for the July 4 holiday, so that they could see Patricia and

Richard there without Dianne's knowledge. Barry anticipated that if Dianne found out, they would "not . . . see [Patricia] and [Richard] for a while." According to Barry, they had a nice weekend together overall. During the gathering, however, Patricia and Richard said that they did not like living with Dianne and were "very upset, unhappy," but they would not explain in detail. Barry recalled that Patricia said, "'Do not let [Richard] go back to [Downers] Grove. I'm older. I can stay there, but do not let [Richard] go back.'" A couple of weeks later, Barry and Colleen received letters from Patricia and Richard. The letters stated that Barry and Colleen had done "bad things" and that Patricia and Richard no longer wanted to see them. Barry testified that he attempted to contact Patricia and Richard multiple times, without success, and that Richard uncharacteristically turned him away when Barry attempted to visit Richard at work.

Barry testified that after July 2015, "we . . . filed many wellness visits to Downers Grove" and "a missing persons report" out of concern for Patricia and Richard. In 2017 and 2018, Colleen initiated proceedings in Illinois, alleging that Dianne was confining Patricia and abusing her health care power of attorney. Colleen also petitioned for guardianship of Patricia. Barry testified that Dianne appeared at related hearings, but that Patricia did not. He testified that Dianne provided reasons why Patricia was absent, such as illness. Barry recounted that after about 6 to 9 months of Patricia's being absent from court proceedings, Dianne explained that Patricia had moved to Las Vegas, Nevada, because Illinois was too cold. Some of the proceedings were ultimately dismissed. Barry opined that at this time, Patricia and Richard were not capable of living on their own or of handling their own finances.

The county court heard other testimony that after moving to Illinois to live with Dianne in 2014, Patricia and Richard moved to other locations. According to Dianne, it was

Patricia's decision to move and she and Richard were capable of living on their own, with Patricia requiring some assistance. In early 2018, Patricia moved from Illinois to Nevada, where she resided with Dianne's mother-in-law, and Richard soon joined her. Dianne testified that because "sheriffs or other people" were coming into that residence, Patricia "wasn't really having very much peace" and felt "uncomfortable that she was caus[ing] a scene [in another woman's] home." Due to these concerns, Dianne said, Patricia and Richard started to consider moving out of the country. Dianne testified that at some point in the summer of 2018, Patricia moved again, this time to an apartment in Wisconsin.

Also in the summer of 2018, Patricia signed documents in Nevada to give Mark durable power of attorney for financial matters. Mark explained that the purpose of the power of attorney was to enable him to write checks to pay Patricia's taxes. Mark testified that a third-party company prepared Patricia's tax return and that he wrote the check for her tax liability because he wanted "to make sure that there were, like, her social security number was on there" and "[i]t was just easier for [him] to do it than to tell her to do five things that she wouldn't do until a-whole-nother year away."

Dianne testified that upon Patricia's request, Dianne accompanied Patricia to look at properties in Costa Rica and Panama in 2018. Patricia ultimately purchased a property in Panama, with the intention of living there seasonally. Dianne testified that Patricia had purchased the property without any instructions, advice, or participation by Dianne and that she did not have concerns about Patricia's ability to make financial decisions. Dianne testified that she visited Patricia in Panama six times in 2018 and 2019. While in Panama, Dianne helped Patricia by driving her around, caring for her, and getting groceries. Barry testified that he later learned that title to the property was held by an entity of which Mark and Dianne's husband were directors.

In November 2019, Patricia moved to an "Airbnb" in Illinois; Dianne testified that she provided the groceries and prepared meals for Patricia and Richard there.

Barry testified that during Patricia's moves, he hired a private investigator to locate Patricia in Illinois or Las Vegas, but that the private investigator could not find her. Despite an Illinois court order demanding that Patricia be produced, Patricia was not produced, and the court issued a warrant or "body writ" to locate her.

Barry did not know Patricia's whereabouts for 2½ years. Then in March 2020, Richard died suddenly and Patricia was taken into custody in Illinois pursuant to the body writ.

Dianne testified that when Patricia appeared in the Illinois court in March 2020, she "looked great," but was not feeling well. Barry testified that when he was reunited with Patricia in 2020, her condition had changed dramatically from when he last saw her in 2015. According to Barry, in 2020 Patricia did not know any of her children. Barry testified that she was not in a condition to live by herself. She had no knowledge of where she was or why she had gotten there. She had no knowledge of any of her assets. On March 6, 2020, an Illinois circuit court issued an order in which it found an emergency basis existed to appoint Barry as the temporary guardian of Patricia's estate and person. Weeks later, the Illinois court appointed Barry perpetual guardian and conservator for Patricia.

Barry ultimately placed Patricia in a memory care unit at an assisted living facility. Barry testified that as of September 21, 2020, Patricia did not know any of her children. She could feed herself if food was placed in front of her; she still needed help getting in and out of the bathroom and in and out of bed. Patricia died in February 2021.

Barry admitted that he did not personally observe Mark or Dianne participate in any of the disputed expenditures.

Based on this evidence, the county court made specific factual findings, including that "[a]s Patricia's mental and physical health declined, Mark and Dianne's dominion and control

over the trust increased to the point that Patricia was merely a conduit for their actions." It determined that Mark and Dianne had "participat[ed] in a breach of trust committed by Patricia or, more likely, . . . induc[ed] Patricia to commit breach while she was in their care and control."

Now on appeal, Mark and Dianne assert that there is "no evidence" that they participated in any breach of trust by Patricia. Brief for appellants at 30. Although it is undisputed that Barry did not personally witness Mark and Dianne's participation in any of the disputed expenditures, we cannot accept Mark and Dianne's position that there was no evidence to support an inference that they did.

We perceive in the facts above competent evidence that after Patricia's move from Nebraska to Illinois, at a time when Patricia's cognitive condition would not allow her to make financial decisions, Mark and Dianne exercised control over the trust assets. This supports the inference that, under the framework above, Mark and Dianne participated in any breaches of trust that occurred during that period: Taken together, the facts above include competent evidence to support the inference that Mark and Dianne "perform[ed] or join[ed] in performing," any acts that constituted a breach of trust after Patricia moved to Illinois, "knowing that it would or might be a breach of trust." See Restatement (Third) of Trusts § 104, comment *f*. at 91 (2012). Certainly, Mark and Dianne presented a different picture of Patricia's decisions in her final years. But Barry supported his burden of proof with competent evidence, and it was the province of the county court to choose to credit Barry's version. See *In re Estate of Walker*, 315 Neb. 510, 997 N.W.2d 595 (2023). We find no error in the county court's determination that under the Restatement, Mark and Dianne participated in the breaches of trust identified below.

### (ii) Breaches of Trust Resulting in Loss

Having determined that competent evidence supported the county court's finding that Mark and Dianne exercised control

over the trust assets after Patricia moved from Nebraska to Illinois, we turn our attention to the individual disputed expenditures to examine whether there was competent evidence that they were breaches of the trust resulting in loss to the trust. The parties agree that the judgment was based upon the following disputed expenditures from Patricia's Chase account, summarized by Barry in an exhibit, reproduced in part as follows:

> Payments Made For Benefit of Dianne Yahiro and Mark Masek from the Charles and Patricia Masek Family Trust:
>
> $350K - Greg and Dianne Yahiro monthly checks (appx. $6,600-$7,000 per month).
>
> $30K - Villanova (presumably for one of the Yahiro kid's school).
>
> $14K - Michael Yahiro [Dianne's son].
>
> $60K - Richard Masek.
>
> $545K - Wire transfers to Panama.
>
> $135,858 - Payment For Taxes.
>
> $142K - Ending balance in Chase late 2018 - debited out of account. Possibly went towards paying off $100K+ tax bill for liquidating annuity/retirement.
>
> Above total is $1,276,858.

Mark and Dianne's arguments take issue with each of these amounts. Barry, for his part, generally asserts that because the trust funds were eventually depleted while Patricia was under the care and control of Mark and Dianne, breaches of trust in the amounts above necessarily occurred. We reject this notion. We cannot simply assume that anything that occurred on Mark and Dianne's watch satisfied the elements of the Restatement. Our analysis requires us to isolate and examine each individual expenditure above to determine whether each was a breach of trust resulting in loss to the trust.

Before deciding whether the expenditures above were breaches of trust, we pause to review the pertinent terms of the trust. During all relevant times, Patricia was sole surviving settlor and trustee of an irrevocable family trust. Although

the trust provided that a trustee could be disqualified due to disability, as defined under the specific terms of the trust, Patricia was never determined to be disabled under such terms. The trust consisted of a marital share and a family share. For the marital share, the trust allowed the "Trustee . . . from time to time [to] distribute to the surviving [settlor] or apply for his or her benefit such portions of the principal [of the marital share] as Trustee deems advisable to provide liberally for his or her care, maintenance, comfort, and enjoyment." The trust also provided that "[t]he surviving [settlor] may withdraw all or any portion of [the marital share of] the Trust Estate at any time by written request filed with [the] Trustee," though there is no evidence that this term was invoked relative to the disputed expenditures. As to the family share, the trust required that the "Trustee shall distribute to [the] surviving [settlor] such portions of the principal [of the family share] as may be necessary for the medical expense, support and maintenance of said surviving spouse."

In light of the trust terms, we ultimately conclude that there was competent evidence that several of the disputed expenditures were breaches of trust that caused losses to the trust, but not all of them.

### a. $350,000 for In-Home Care

Among the disputed expenditures that made up the judgment were monthly payments to Dianne and her husband of approximately $6,000 or $7,000 each, totaling $350,000. There was evidence that the payments were intended to compensate Dianne and her husband for caring for Patricia.

The county court heard evidence that while Patricia lived in Dianne's home, Dianne prepared her meals, did her laundry, observed her hygiene, provided companionship, took Patricia to social and cultural activities, exercised with Patricia, and slept in the same room as Patricia "so that she was safe going to the bathroom in the middle of the night."

Mark and Dianne testified that the monthly payments began after Patricia expressed a wish to compensate Dianne for the

in-home care. Mark and Dianne recalled that the payments of approximately $7,000 per month were based on quotes from third-party care providers for "non-specialized" care and set at 10 percent less than the lowest daily rate. Mark and Dianne testified that the payments began in 2016, with some of them retroactive for past services.

Barry testified that when Patricia moved to Downers Grove, he suggested that Dianne receive payment for expenses such as food, clothing, and transportation, but Dianne refused. He denied being consulted about the subsequent monthly payments. Barry opined that Patricia did not require extraordinary care to justify payment of approximately $7,000 per month, adding that he saw Patricia for only 2 or 2½ years after her move to Downers Grove before contact ceased. Barry testified that in his view, it was not reasonable for Patricia to pay $7,000 per month to Dianne for in-home care. He believed Patricia's monthly income from her teacher's pension and Social Security, totaling about $1,500, should have been sufficient for her living expenses. He acknowledged that after he was appointed Patricia's guardian in 2020, he personally paid approximately $7,000 per month for her to live in the memory unit of an assisted living facility.

The county court ultimately found that "[p]ayment of trust assets to Dianne as authorized by Mark were excessive and constituted a breach of the trust." The parties agree that based on this finding, the judgment included $350,000.

On appeal, Mark and Dianne assert that even if the $350,000 for in-home care consisted of trust funds, there was no evidence that those funds were not expended for Patricia's care, maintenance, and enjoyment, in compliance with the terms of the trust. They also contend that there could be no breach of trust because Patricia agreed to make the payments and that they were reasonable.

We conclude that the county court erred in treating these expenditures as breaches of trust. Mark and Dianne presented evidence that Dianne provided services to Patricia in the areas

of hygiene, exercise, entertainment, meals, and getting to the bathroom at night. The payments for this in-home care fall into a permissible category of expense under the trust language allowing trust assets to be spent "as may be necessary" for Patricia's "medical expense, support and maintenance." Moreover, testimony by Mark and Dianne suggested that the payments for in-home care were reasonable because they were comparable to the cost of nonspecialized third-party care. Barry, on the other hand, did not produce evidence that the in-home care Dianne provided was unnecessary; nor did he counter Mark and Dianne's evidence that the monthly payments were reasonable compared to the cost of third-party caregivers. In fact, Barry took the position at trial that while Patricia was under Dianne's care, her cognitive ability was substantially compromised, and he testified that he paid $7,000 per month for Patricia's care in a memory unit after they were reunited. Consequently, we find the record lacks competent evidence that the expenditures for in-home care were breaches of trust, and the county court erred in including those amounts in the judgment. We therefore modify the judgment by reducing it $350,000.

### b. $30,000 to Villanova University

There is no dispute that the judgment compensated for a $30,000 check that Patricia wrote to "Villanova University." Dianne testified that this check was for a tuition bill for Dianne's daughter. According to Dianne, she and her husband had forgotten the bill was due and did not have time to liquidate assets to pay it. She testified that she and her husband paid Patricia back, and the county court received copies of checks from Dianne to Patricia, totaling $30,000. Dianne testified that these checks were written to reimburse Patricia for the payments to Villanova. One of the checks bore the note "[l]oan [r]epayment." Bank statements in evidence from Chase reflect that amounts corresponding with these checks were deposited in Patricia's account within days of the dates on the checks.

Mark and Dianne suggest, among other things, that the tuition payment did not constitute a loss to the trust, because it was a loan that Dianne repaid. Upon our review of the bank statements, we agree, and we conclude that competent evidence did not support the county court's finding that the Villanova University payment occasioned a loss to the trust, such that Mark and Dianne could be liable under the relevant theory of liability. We therefore modify the judgment by reducing it $30,000.

### c. $14,000 to Dianne's Son

The parties do not dispute that the judgment encompassed a check Patricia wrote to Dianne's son for $14,000. Dianne characterized it as a gift. When asked what the payment was for, Dianne testified that Patricia was very grateful to him for spending time with her and helping her by driving her around, making her meals, and playing cards with her.

We view the above as competent evidence that the payment to Dianne's son constituted a breach of trust, causing a loss to the trust. Mark and Dianne's brief emphasizes evidence that the payment was a gift, suggesting that the payment was for Patricia's "'enjoyment,'" consistent with the terms of the trust. Brief for appellants at 24. But given the competent evidence of Patricia's cognitive state, summarized above, when this expenditure was made, Patricia was not in a condition to "deem[]" it "advisable" as required by the terms of the trust.

### d. $60,000 to Richard

A portion of the judgment corresponded with a $60,000 payment from Patricia's Chase account to Richard. Dianne testified that Richard had a full-time job with benefits and that she did not know whether Patricia assisted him financially.

This was competent evidence to support the county court's decision that the payment to Richard was a breach of trust, causing a loss to the trust. Mark and Dianne again submit that the payment was for Patricia's "'enjoyment.'" *Id*. We

reiterate, however, that Patricia's cognition did not allow her to "deem[]" the payment "advisable."

### e. $545,000 Wired to Panama

In support of the judgment, the order on remand referred to the purchase of a "$500,000 condo in Columbia." It is clear that the county court mistakenly stated "Columbia" rather than "Panama." And the parties agree that the judgment consisted of compensation for the $545,000 wire transfer to purchase a condominium in Panama.

As with other expenditures, Mark and Dianne argue that the county court erred in concluding that the purchase of the Panama property was a breach of trust because it did not go against the terms of the trust. Again, they point to trust terms allowing Patricia to spend trust assets for her "care, maintenance, comfort, and enjoyment" as she "deems advisable" or to spend trust assets "as may be necessary" for her "medical expense, support and maintenance." Like we have reasoned regarding other expenditures, Patricia was not cognitively able to "deem[]" expenditures "advisable," particularly not one as peculiar and significant as the purchase of the Panama property. And it cannot be said that the purchase of a property in a foreign country was "necessary" for her "medical expense, support and maintenance."

Mark and Dianne also contend that there could be no loss to the trust due to the purchase because if the Panama property was purchased with trust funds, the trust owned the property. Barry testified, however, that he had been unable to locate the property purchased in Panama, but he had discovered it was held by an entity that named Mark and Dianne's husband as directors. Given competent evidence that the property was held and controlled by an entity listing Mark and Dianne's husband as directors, we see no merit to Mark and Dianne's argument that the purchase resulted in no loss to the trust. We conclude there was competent evidence that the purchase of the property in Panama using trust assets breached the trust.

### f. $135,858 and $142,000

The parties concur that the county court's judgment accounted for outlays of trust assets that Barry alleged, in the amounts of $135,858 and $142,000.

Barry testified that a $135,858 tax payment was made from trust assets and that the taxes were owed because Patricia had liquidated a "Roth IRA account." Barry also stated that in October or November 2018, Mark, Dianne, and her husband wired $142,000 from the trust assets "out somewhere," leaving the Chase account balance at zero.

Mark agreed that he made the $135,858 tax payment for Patricia. Dianne elaborated that Mark wrote the check to the Internal Revenue Service while the Chase account was frozen due to the Panama transaction. Thus, Dianne said, the check was never cashed and was returned. Bank records in evidence confirm that $135,858 was not deducted from the Chase account at the relevant time.

Dianne testified that afterward, the Chase account was closed and Patricia was issued a cashier's check for around $142,000. Bank statements confirm that $142,843.61 was debited from the account in December 2018, leaving the account with a balance of zero. Dianne opined that that two entries on Barry's exhibit—"'[$]135,858 payment for taxes,' and . . . '[$]142k ending balance in [C]hase late 2018 debited out of account, possibly went toward paying off [$]100k+ tax bill for liquidating annuity retirement"—represented the same tax payment.

Regarding the check for $135,858, Mark and Dianne point to the evidence that it did not clear, indicating that there was no loss to trust assets. We agree. We cannot conclude that competent evidence supported a judgment in this amount when bank statements show that it was never deducted from trust assets.

As for the $142,000, Barry's testimony that the money was wired "out somewhere" is not competent evidence of a breach of trust. On the other hand, Dianne opined, and Barry agreed that it was a possibility, that the $142,000 was used to pay

taxes. We view the payment of taxes to be "necessary" for Patricia's "maintenance" and therefore in compliance with the terms of the trust.

Consequently, we modify the judgment so as not to include sums of $135,858 and $142,000.

### (f) Evidentiary Rulings

In addition to their contention that the judgment against them was not supported by competent evidence, Mark and Dianne argue that the district court made several erroneous evidentiary rulings. As we will explain, we find no reversible error.

First, Mark and Dianne assert that the county court erroneously received documentation produced by Patricia's attorney, over their objections. This documentation was received along with a foundational affidavit by Barry's attorney stating that it was the file of Patricia's attorney that was obtained via discovery. Barry's counsel argued that the file was offered to show Patricia had not had any contact with her attorney and that it was Mark who communicated with Patricia's attorney. As they did before the county court, Mark and Dianne assert that the exhibit was inadmissible because it was not relevant and because Patricia's attorney was not available to authenticate its contents. We need not resolve these issues. Even if these objections had merit, admission of the exhibit—to show that Patricia was not in charge of her own circumstances—would not be reversible error, given all the other competent evidence received on the topic, which we have discussed at length above. See *In re Hessler Living Trust*, 316 Neb. 600, 5 N.W.3d 723 (2024) (in civil case, admission or exclusion of evidence is not reversible error unless it unfairly prejudiced substantial right of complaining party).

Second, Mark and Dianne offered affidavits from two physicians stating that Patricia could manage her person and estate in 2018; Mark testified that he relied on the affidavits in his dealings with Patricia and with third parties on her

behalf. The county court sustained Barry's hearsay and foundation objections to the exhibits. On appeal, Mark and Dianne argue that they were admissible, not for the truth of the matter asserted, but to show their effect on Mark's state of mind, because intent is an element of "inducement." Brief for appellants at 44. Mark and Dianne also submit that the affidavits were self-authenticating under Neb. Rev. Stat. § 27-902(8) (Reissue 2016).

We need not resolve these arguments because the exclusion of the affidavits cannot rise to the level of reversible error, as it did not unfairly prejudice a substantial right of Mark and Dianne. See *In re Hessler Living Trust, supra*. On this point, we must bear in mind that the affidavits were not admissible for the truth of the matter asserted—that Patricia was capable of managing her person and estate in 2018. At most, the emails would have been admissible to show that Mark *believed* Patricia was capable of managing her person and estate in 2018. But given the county court's findings regarding Patricia's lack of capacity at that time, we see no realistic possibility the county court, even if it had considered the physician affidavits, would have concluded that Mark had no knowledge of Patricia's lack of capacity.

Third, Mark and Dianne assert that the county court erred in declining to receive a letter allegedly authored by Patricia. Their sole argument in this regard is that Barry did not object to its admission. We disagree. We have reviewed the record, and it is clear to us that Barry objected to the exhibit and that the county court sustained that objection.

### 3. JUDGMENT "IN FAVOR OF BARRY"

Having established Mark and Dianne's liability, we turn to their claim that on remand, the county court erred in entering judgment "'in favor of Barry . . . as executor of the Estate of Patricia Masek, trustee and beneficiary of the Charles and Patricia Masek Family Trust.'" They argue that any judgment for damages should be paid directly to the family trust, of

which Barry, Mark, Dianne, and Colleen remained cotrustees. Barry counters that we found this argument to be without merit in our initial opinion.

We begin with Barry's suggestion that this issue is barred by law of the case, and we conclude that the issue is not barred. Recall that law of the case is a procedural doctrine that bars reconsideration of the same or similar issues at successive stages of the same suit or prosecution. *Tierney v. Tierney*, 309 Neb. 310, 959 N.W.2d 556 (2021). The county court's initial order entered judgment against Mark and Dianne "in favor of Barry . . . as Guardian and Conservator for Patricia . . . , Trustee and Beneficiary of the Charles and Patricia Masek Family Trust." The county court later revived the judgment "in [Barry's] name as Administrator and Representative for the Estate of Patricia . . . , deceased." Apparently overlooking the revivor, Mark and Dianne assigned in their initial appeal that the county court erred in entering judgment in favor of "Barry . . . as Guardian and Conservator for Patricia . . . , Trustee and Beneficiary of the Charles and Patricia Masek Family Trust." We expressly rejected this position. See *In re Masek Family Trust*, 312 Neb. 94, 977 N.W.2d 919 (2022). On remand, the county court entered judgment in favor of Barry, "as executor of the Estate of Patricia Masek, trustee and beneficiary of the Charles and Patricia Masek Family Trust." It is this judgment that Mark and Dianne now challenge. Because it is a judgment for Barry in a different representative capacity from that in the judgment we addressed in the initial appeal, there is no bar to addressing it here.

That said, to the extent Mark and Dianne argue that the county court erred by not entering judgment in favor of the trust itself, we disagree. We agree with Mark and Dianne that the amount of the judgment should be restored to the trust. The Restatement (Third) of Trusts § 104(2) at 90 (2012) provides that "[i]f a beneficiary is personally liable to the trust, the trust is entitled to a charge against the beneficiary's interest in the trust to secure the payment of the liability."

As we observed in our initial opinion, the commentary to the Restatement elaborates: "If a beneficiary participates in a breach of trust, causing a loss to the trust . . . , the beneficiary is personally liable to the trust for all or part of the loss, as appropriate." *Id.*, comment *f.* at 91. But the county court did not have to enter judgment in favor of the trust to ensure that judgment funds would be restored to the trust. We perceive the county court's order on remand to recognize that Barry should not have the freedom to dispose of the judgment funds however he wishes and that he is required by law to act in accordance with the duties and powers of his representative capacity in relation to the judgment. See Neb. Rev. Stat. §§ 30-3866 to 30-3882 (Reissue 2016 & Cum. Supp. 2024) (duties and powers trustees). Yet, the judgment in favor of Barry "as executor of the Estate of Patricia . . . , trustee and beneficiary of the Charles and Patricia Masek Family Trust" is not completely clear to us. It could be read as a judgment properly entered in favor of Barry as cotrustee of the family trust, but it could also be susceptible to other readings. To dispel any confusion, we modify the judgment to be in favor of Barry in his capacity as cotrustee of the Charles and Patricia Masek Family Trust.

### 4. Additional Attorney Fees

Mark and Dianne argue that the county court erred in ordering them to pay additional attorney fees that Barry claimed to have incurred on remand. We are unpersuaded.

Mark and Dianne first assert that the award of additional attorney fees exceeded the scope of our mandate and was therefore void. Mark and Dianne do not explain how such an award exceeded the scope of our mandate, and we do not read our mandate so narrowly. Our initial opinion reversed the order denying new trial and remanded the cause "for further proceedings consistent with this opinion, including, but not limited to, conducting a hearing wherein the parties would have the opportunity to present evidence or arguments

concerning [Mark and Dianne's] liability to the trust." *In re Masek Family Trust*, 312 Neb. 94, 107, 977 N.W.2d 919, 928 (2022). This language did not preclude an award of attorney fees associated with proceedings on remand. To the contrary, such an award was part and parcel with the further proceedings contemplated in our mandate. See Neb. Rev. Stat. § 30-3893 (Reissue 2016) (providing for award of attorney fees "[i]n a judicial proceeding involving the administration of a trust").

Mark and Dianne also contend that even if the award of additional attorney fees was not void, it was in error because it encompassed attorney services rendered before the order on remand that decided the merits of the case and that also awarded attorney fees. According to Mark and Dianne, this "defies reason." Brief for appellants at 41. We cannot agree. As we have explained, the county court's order of judgment on remand reiterated the same amount for attorney fees that the county court awarded in the initial order; Mark and Dianne do not contest this award of fees in the present appeal. After entering the judgment on remand, the county court received evidence at a hearing on Barry's request for attorney fees incurred on remand, and it awarded additional fees for that period. Section 30-3893, referenced above, authorizes an award of attorney fees "[i]n a judicial proceeding involving the administration of a trust." The proceedings on remand in this case involved the administration of a trust. Thus, the additional attorney fees were authorized by statute, and we see no error in the sequence of events that led up to that award.

Finally, Mark and Dianne assert that even if the award of attorney fees was not void, it was error because it was unreasonable. At the hearing on additional attorney fees, the county court received an affidavit by Barry's attorney affirming the total fees incurred from the date of our mandate in the initial appeal, as shown by the invoices attached to the affidavit. The billing entries in those invoices were for services rendered after we remanded the matter. The county court awarded additional attorney fees consistent with the affidavit

and attached invoices. On appeal, Mark and Dianne dispute certain billing entries in the invoices and claim the fees did not stem from proceedings specific to this court's mandate on remand. Barry, for his part, offers plausible reasons why the disputed entries are related to this case on remand, noting the interplay of this matter involving the family trust, another matter involving a "Masek Children's Trust," and proceedings in Illinois. Having reviewed the disputed entries, we conclude that Mark and Dianne have not identified any abuse of discretion in the amount of additional attorney fees. See *BCL Properties v. Boyle*, 314 Neb. 607, 992 N.W.2d 440 (2023).

## V. CONCLUSION

As we have explained, the county court's judgment included certain amounts that were not supported by competent evidence, and we conclude that the language awarding the judgment in favor of Barry requires clarification. Otherwise, we find no merit to the errors assigned and argued by the parties. Accordingly, we affirm but modify the judgment from $1,276,858 to $619,000, in favor of Barry in his capacity as cotrustee of the Charles and Patricia Masek Family Trust.

Affirmed as modified.

Heavican, C.J., not participating in the decision.