Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/18/2025 09:09 AM CDT

HENDERSON STATE COMPANY, A NEBRASKA BANKING
CORPORATION, PLAINTIFF, APPELLEE, v. TODD W.
GARRELTS AND NANCY J. GARRELTS, DEFENDANTS
AND THIRD-PARTY PLAINTIFFS, APPELLANTS, AND
KEVIN D. POSTIER, ET AL., THIRD-PARTY
DEFENDANTS, APPELLEES.

___ N.W.3d ___

Filed July 18, 2025.    No. S-24-839.

1. **Appeal and Error.** Errors assigned but not argued will not be addressed by an appellate court.
2. **Standing: Appeal and Error.** An appellate court reviews the lower court's factual findings on standing for clear error and reviews de novo the ultimate question whether the plaintiff has standing.
3. **Contracts: Guaranty.** A guaranty is interpreted using the same general rules as are used for other contracts.
4. **Contracts: Judgments: Appeal and Error.** The meaning of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below.
5. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.
6. ____: ____. An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.
7. **Actions: Parties: Standing: Jurisdiction.** Whether a party who commences an action has standing and is therefore the real party in interest presents a jurisdictional issue.

8. **Trial: Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.

9. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

10. **Summary Judgment: Proof.** The party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial. If the burden of proof at trial would be on the nonmoving party, then the party moving for summary judgment may satisfy its prima facie burden either by citing to materials in the record that affirmatively negate an essential element of the nonmoving party's claim or by citing to materials in the record demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.

11. **Assignments: Actions: Parties: Standing: Jurisdiction: Proof.** An assignee can establish standing to bring an action in its own name, and thus show the court had subject matter jurisdiction, if it proves by the greater weight of the evidence the existence of a written assignment under Neb. Rev. Stat. § 25-304 (Reissue 2016).

12. **Contracts: Guaranty: Debtors and Creditors: Words and Phrases.** A guaranty is a contract by which the guarantor promises to make payment if the principal debtor defaults.

13. **Contracts: Guaranty: Appeal and Error.** To determine the obligations of the guarantor, an appellate court relies on general principles of contract and guaranty law.

14. **Contracts: Guaranty: Intent.** Because a guaranty is a contract, it must be understood in light of the parties' intentions and the circumstances under which the guaranty was given.

15. **Guaranty: Liability.** When the meaning of a guaranty is ascertained, or its terms are clearly defined, the liability of the guarantor is controlled absolutely by such meaning and limited to the precise terms.

16. **Contracts: Guaranty: Words and Phrases.** A guaranty is a collateral undertaking to answer for the payment of debt or the performance of a contract or duty, and when a guaranty is unambiguous, a court does not vary its terms by construing it with another instrument.

17. **Guaranty.** The undertaking of a guaranty is independent of the promise of the principal obligation.

18. **Fraud: Proof.** To prove fraudulent concealment, a plaintiff must prove these elements: (1) The defendant had a duty to disclose a material fact; (2) the defendant, with knowledge of the material fact, concealed the fact; (3) the material fact was not within the plaintiff's reasonably diligent attention, observation, and judgment; (4) the defendant concealed the fact with the intention that the plaintiff act or refrain from acting in response to the concealment or suppression; (5) the plaintiff, reasonably relying on the fact or facts as the plaintiff believed them to be as the result of the concealment, acted or withheld action; and (6) the plaintiff was damaged by the plaintiff's action or inaction in response to the concealment.

19. **Contracts: Principal and Surety: Debtors and Creditors.** Where the surety makes no inquiry on the subject, the duty of disclosure as to facts increasing the risks of the undertaking depends upon the circumstances of the case. Generally, the creditor may assume that the surety has obtained information from other sources or has chosen to assume whatever risks may be involved. A duty of disclosure may arise when the creditor knows or has good grounds for believing (1) the surety is being deceived or misled or (2) the surety has been induced to enter the contract in ignorance of facts materially increasing his or her risks, of which the creditor has knowledge and which the creditor has the opportunity to disclose prior to the surety's acceptance of the undertaking.

20. ____: ____: ____. Deception or ignorance of the facts is not presumed; there must be some evidence that would put the lender on notice that the surety was being deceived or was ignorant of the facts.

21. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it.

22. **Fraud: Proof.** A fraudulent misrepresentation claim requires a plaintiff to establish the following elements: (1) A representation was made; (2) the representation was false; (3) when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) the representation was made with the intention that the plaintiff should rely on it; (5) the plaintiff did so rely on it; and (6) the plaintiff suffered damage as a result.

23. **Conspiracy: Words and Phrases.** A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.

24. **Actions: Conspiracy: Torts: Words and Phrases.** A "conspiracy" is not itself a separate and independent tort, but, rather, depends upon the

existence of an underlying tort. Without such underlying tort, there can be no cause of action for conspiracy to commit the tort.

25. **Contracts: Parties.** The implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties do anything which will injure the right of another party to receive the benefit of the contract.

26. ____: ____. The nature and extent of an implied covenant of good faith and fair dealing are measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously, or unreasonably, that conduct exceeds the justifiable expectations of the second party.

27. **Contracts.** The question of a party's good faith in the performance of a contract is a question of fact.

28. **Summary Judgment.** The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; only disputes over facts that under the governing law might affect the outcome of the suit will properly preclude the entry of summary judgment.

29. **Decedents' Estates.** Generally, termination of appointment of a personal representative ends the right and power pertaining to the office of personal representative.

Appeal from the District Court for York County: James C. Stecker, Judge. Affirmed.

Keith A. Harvat, of Houghton Bradford Whitted, P.C., L.L.O., for appellants.

Lindsay K. Lundholm and James T. Schmidt, of Baird Holm, L.L.P., for appellees.

Funke, C.J., Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Cassel, J.

## I. INTRODUCTION

This appeal arises from a bank holding company's action against two guarantors on their respective personal guaranties of an entity's debts. The district court entered summary judgment against the guarantors. It rejected their argument that

the bank holding company lacked standing and determined that the plain language of the guaranties controlled. It also refused an attempt to shift liability to an estate. The guarantors appeal. Because we find no error or abuse of discretion, we affirm.

## II. BACKGROUND

### 1. Guaranties

The action proceeded against a husband and wife, Todd W. Garrelts and Nancy J. Garrelts. The Garrelts were members of Midwest Auger Distributing, L.L.C. (Midwest Auger). David F. Lynn, who is now deceased, asked the Garrelts to join him in forming Midwest Auger in the spring of 2015. Based on their conversations with Lynn, the Garrelts understood that Midwest Auger would purchase the accounts receivable of Peck Manufacturing, Inc. (Peck), another entity owned by Lynn, and that the Garrelts would receive a portion of Midwest Auger's profit.

On May 21, 2015, the Garrelts signed identical personal guaranties for the debts that Midwest Auger owed to Henderson State Bank (HSB). The guaranties expressly included Midwest Auger's future indebtedness and specifically referred to a "promissory note . . . from Midwest Auger . . . in the amount of $1,500,000.00." We will discuss the loan in more detail below.

Each guaranty consisted of four pages, and the Garrelts' signatures appear at the bottom of the third page. The record indicates that Lynn and his wife also signed identical personal guaranties, but theirs are not at issue here.

Several provisions in the guaranties are relevant. The Garrelts represented that they were "unconditionally liable under this [g]uaranty, regardless of whether or not [HSB] pursue[d] any of [its] remedies against [Midwest Auger], against any other . . . guarantor . . . or against any [p]roperty." They said that HSB "may sue [them] alone, or anyone else who is obligated on this [g]uaranty, or any [or all of them] together, to collect the [d]ebt." They also represented that their

"liability is not conditioned on the signing of this [g]uaranty by any other person and further is not subject to any condition not expressly set forth in this [g]uaranty or any instrument executed in connection with the [d]ebt." They "consent[ed] to all renewals, extensions, modifications and substitutions of the [d]ebt" made by HSB, in its discretion, "without further notice to [them]."

Additionally, the Garrelts "agree[d] that this is an absolute and unconditional [g]uaranty," which "will remain binding on [them], whether or not there are any [d]ebts outstanding, until [HSB] ha[s] actually received written notice of [their] revocation." They agreed that "if any other person signing this [g]uaranty provides a notice of revocation to [HSB], [they] will still be obligated under this [g]uaranty until [they] provide such a notice of revocation to [HSB]." And, "If any other person signing this [g]uaranty dies . . . , such fact will not affect [their] obligations under this [g]uaranty."

The Garrelts further agreed that

> any [p]roperty may be assigned, exchanged, released in whole or in part or substituted without notice to [them] and without defeating, discharging or diminishing [their] liability. [Their] obligation is absolute and [HSB's] failure to perfect any security interest or any act or omission by [HSB] which impairs the [p]roperty will not relieve [them] or [their] liability under this [g]uaranty. [HSB is] under no duty to preserve or protect any [p]roperty until [HSB is] in actual or constructive possession.

The guaranties contemplated that HSB may take certain actions, including "releas[ing], substitut[ing] or impair[ing] any [p]roperty," and that the Garrelts "generally waive[d] defenses that may be available based on [HSB's] actions or based on the status of a party to the [d]ebt or this [g]uaranty." They waived "all claims for loss or damage caused by [HSB's] acts or omissions where [it] acted reasonably and in good faith."

Also relevant here, the Garrelts represented and warranted that the guaranties were "entered into at the request

of [Midwest Auger]" and that the Garrelts were "satisfied regarding [Midwest Auger's] financial condition and existing indebtedness, authority to borrow and the use and intended use of all [d]ebt proceeds." They further represented and warranted that they "ha[d] not relied on any representations or omissions from [HSB] or any information provided by [HSB] respecting [Midwest Auger], [its] financial condition and existing indebtedness, [its] authority to borrow or [its] use and intended use of all [d]ebt proceeds."

The Garrelts expressly acknowledged that HSB was relying on the guaranties in extending credit to Midwest Auger and that they signed the guaranties "to induce [HSB] to extend such credit." The guaranties stated that HSB "may rely conclusively on a continuing warranty" that the Garrelts "continue[d] to be benefited by this [g]uaranty and [HSB] will have no duty to inquire into or confirm the receipt of any such benefits, and this [g]uaranty will be effective and enforceable by [HSB] without regard to the receipt, nature or value of any such benefits."

Finally, the guaranties reiterated that if HSB "assign[ed] any of the [d]ebts, [it] may assign all or any part of this [g]uaranty without notice to [them] or [their] consent, and this [g]uaranty will inure to the benefit of [HSB's] assignee to the extent of such assignment."

## 2. LOAN

HSB loaned Midwest Auger $1.5 million as a "2015 Business Operating Line of Credit." On May 21, 2015, Lynn signed a promissory note for that amount that listed HSB as the lender and Midwest Auger as the borrower. The note stated that a final payment of the entire unpaid outstanding balance of principal and interest would be due in May 2016. By July 31, 2015, the line of credit was fully extended, and it became necessary that Midwest Auger repay HSB for the amounts advanced to it. Midwest Auger failed to do so.

Beginning in 2016, Midwest Auger extended the maturity date four separate times. A renewal note and three subsequent

agreements to that effect were signed by Kevin D. Postier, who was the president of HSB, and Lynn, on behalf of Midwest Auger.

Following the final extension agreement, HSB assigned its rights under the loan documents, including the personal guaranties, to HSB's parent company, Henderson State Company (HSC). HSC is a bank holding company that is a separate and distinct legal entity from HSB. As part of the exchange, HSC paid to HSB the principal amount of the loan plus interest due and owing. The assignment was memorialized in writing.

In 2018, Midwest Auger failed to make the required payment on the renewal note, and HSC sent the Garrelts a letter demanding payment. The Garrelts did not make payments.

### 3. Lynn's Death and Probate Proceedings

The record indicates that Lynn died in March 2020 and that a probate case was filed in the county court in May. That court appointed Eric B. Schnurer, a creditor of the estate, as the personal representative.

The estate was closed, and the court found "good cause to terminate jurisdiction of the [p]ersonal [r]epresentative," on August 21, 2023—after the instant litigation commenced but well before the entry of summary judgment.

### 4. HSC Sues Garrelts

In May 2021, HSC sued the Garrelts for breach of guaranty. HSC did not attempt to file a claim in the probate case and did not sue Lynn's wife.

The Garrelts' answer to the operative amended complaint set forth counterclaims, styled as "[c]ause[s] of [a]ction," for (1) fraudulent concealment, (2) fraudulent misrepresentation, (3) civil conspiracy, and (4) breach of the implied covenant of good faith and fair dealing. The Garrelts brought the same claims against four additional parties, whom they named as third-party defendants—HSB, Postier, Schnurer, and Lynn's wife. For convenience, we will refer to all causes of action

asserted by the Garrelts against HSC, HSB, and Postier (collectively the Bank) as the "counterclaims" from here on.

The Garrelts' general theory of the case was that HSB, Postier, and Lynn conspired to fraudulently conceal and misrepresent the "tenuous financial situation" of Lynn and various entities he owned, including Peck. The Garrelts asserted that unbeknownst to them, Midwest Auger was created because HSB was "unwilling to loan any further money" to Lynn's other entities. They claimed that they "did not know and could not have known the extent of the financial dealings" between Lynn, his entities, and HSB. They alleged that HSB and Postier failed to "professionally perform their obligations and duties" owed to the Garrelts and that, as a result, the Garrelts were denied their "justified expectations contained within the Midwest Auger [g]uaranty."

As part of their respective answers to the counterclaims, the Bank alleged that neither HSB nor Postier had a legal duty to disclose the financial situation of Lynn's entities to the Garrelts or to advise the Garrelts regarding their and Midwest Auger's financial decisions. The Bank further alleged that a Nebraska banking statute[1] "prohibited [HSB] and . . . Postier from disclosing customer information" in these circumstances.

## 5. Summary Judgment

Following discovery, the Garrelts and the Bank filed motions for summary judgment. The court held a hearing, during which it received evidence from both parties. We will discuss the parties' motions and evidence, as necessary, in the analysis section.

The district court entered a written order overruling the Garrelts' motion and sustaining the Bank's motion, finding the Garrelts were "unconditionally and absolutely liable" for Midwest Auger's debt under the guaranties. It entered

---

[1] See Neb. Rev. Stat. § 8-1401(1) (Reissue 2022) (addressing disclosure of confidential records or information).

judgment in favor of HSC and against the Garrelts in the amount of $1.5 million plus accrued and unpaid interest.

### 6. Subsequent Filing "Confessing" Judgment Against Estate

After the entry of the adverse summary judgment, the Garrelts' counsel filed a document in which Schnurer, purportedly in his capacity as personal representative of Lynn's estate, "confesse[d] and consent[ed]" to the entry of judgment against the estate in the amount of $1.5 million plus accrued and unpaid interest. The filing was styled as a "Confession of Judgment and Consent to Entry of Judgment by Confession." It was both dated and filed on July 26, 2024.

In a subsequent order, the court concluded that this filing was a "nullity" and had "no legal force and effect." It "reaffirm[ed] in full" its summary judgment order and dismissed all remaining causes of action.

The Garrelts filed a timely appeal, which we moved to our docket.[2] No briefs were filed by Schnurer or Lynn's wife, and those parties are not otherwise participating in the appeal.

### III. ASSIGNMENTS OF ERROR

The Garrelts assign 12 errors. They allege, consolidated and restated, that the district court erred in entering an adverse summary judgment upon concluding that (1) HSC had standing, (2) the Garrelts were liable for Midwest Auger's debts pursuant to the personal guaranties, (3) the Garrelts failed to produce evidence showing a genuine issue of material fact regarding the counterclaims, and (4) the "Confession of Judgment and Consent to Entry of Judgment by Confession" filing was a legal nullity.

[1] The Garrelts further assign that the district court erred in adopting, "virtually *verbatim*," a proposed order prepared and submitted by the Bank's counsel; relying on the parol evidence

---

[2] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2024).

rule "when it is the banking practices, administration and monitoring of [the Bank] which are at issue"; and overruling the Garrelts' "Motion for New Trial." Because their brief contains no corresponding argument concerning these alleged errors, we do not consider them. Errors assigned but not argued will not be addressed by an appellate court.[3]

## IV. STANDARD OF REVIEW

[2] An appellate court reviews the lower court's factual findings on standing for clear error and reviews de novo the ultimate question whether the plaintiff has standing.[4]

[3,4] A guaranty is interpreted using the same general rules as are used for other contracts.[5] The meaning of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below.[6]

[5,6] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[7] An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.[8]

---

[3] *City of Omaha v. Professional Firefighters Assn.*, 309 Neb. 918, 963 N.W.2d 1 (2021).

[4] See *Boone River, LLC v. Miles*, 314 Neb. 889, 994 N.W.2d 35 (2023), *modified on denial of rehearing* 315 Neb. 413, 996 N.W.2d 629.

[5] *Cattle Nat. Bank & Trust Co. v. Watson*, 293 Neb. 943, 880 N.W.2d 906 (2016).

[6] *White v. White*, 316 Neb. 616, 6 N.W.3d 204 (2024).

[7] *Galloway v. Husker Auto Group*, 318 Neb. 178, 14 N.W.3d 218 (2024).

[8] *Main St Properties v. City of Bellevue*, 318 Neb. 116, 13 N.W.3d 911 (2024).

## V. ANALYSIS

We divide our analysis into four sections guided by the restated assignments of error set forth above.

We first address the issue raised by the Garrelts' motion for summary judgment—an assertion that HSC lacked standing. This in turn depends upon an evidentiary ruling admitting a written assignment from HSB to HSC.

We then turn to two overarching issues relating to the Bank's motion for summary judgment: the Garrelts' liability under the personal guaranties and the evidence pertaining to the counterclaims. There, contract interpretation principles and the customary standards regarding review of summary judgments apply.

Finally, we consider the legal significance, if any, of the filing purportedly confessing judgment against the estate.

### 1. HSC Had Standing as Assignee

[7] Whether a party who commences an action has standing and is therefore the real party in interest presents a jurisdictional issue.[9] For that reason, we consider the Garrelts' standing argument first.

### (a) Additional Background

The Garrelts moved for summary judgment solely on the ground that HSC lacked standing to sue. They relied upon Neb. Rev. Stat. § 25-304 (Reissue 2016), which states, in part: "Assignees of choses in action assigned for the purpose of collection may sue on any claim assigned in writing." They argued that there had been no production of a written assignment from HSB to HSC of HSB's interest in the loan documents, including the personal guaranties.

In response, the Bank offered affidavits of Postier and the written document memorializing the assignment. The Garrelts argued that the Bank should not be permitted to rely on

---

[9] *Boone River, LLC v. Miles, supra* note 4.

the written assignment, because it was not produced during discovery.

The court rejected their argument and concluded that the written assignment was uncontroverted evidence establishing that HSC had standing. It overruled the Garrelts' motion for summary judgment.

## (b) Discussion

### (i) No Abuse of Discretion in Admitting Written Assignment

Although the Garrelts raise a "factual challenge" to the standing of HSC,[10] their argument hinges on the court's evidentiary ruling. They essentially argue that because the Bank failed to produce the written assignment sooner, the court should have excluded it.

[8,9] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[11] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[12]

We conclude that there was no abuse of discretion in admitting the written assignment. The Garrelts raised lack of standing as an affirmative defense in their answer to HSC's amended complaint, and they raised it again on summary judgment. But we see no error in the court's reasoning that they did not directly request production of the written assignment during discovery. Nothing in the court's reasons or rulings is clearly untenable, unfairly depriving the Garrelts of a substantial right and denying just results in this matter.

---

[10] See *Valley Boys v. American Family Ins. Co.*, 306 Neb. 928, 947 N.W.2d 856 (2020).

[11] *In re Masek Family Trust*, 318 Neb. 268, 15 N.W.3d 379 (2025).

[12] *Backhaus v. Backhaus*, 318 Neb. 891, 20 N.W.3d 81 (2025).

The Garrelts also argue that the evidence was inadmissible based upon cases[13] that involved inconsistent prior testimony of a party. They assert that Postier's affidavits were "'materially different'"[14] from his earlier deposition testimony and that the evidence should have been disregarded as a matter of law. For example, they draw our attention to Postier's varied use of the terms "sold," "transferred," and "assigned" when referring to the exchange between HSB and HSC.

We disagree that Postier's affidavits and deposition testimony were materially different. Although he did not refer to the exchange exclusively as an "assignment," he did not need to do so in order for the evidence to be admissible. Nor was it necessary for the Bank to produce additional evidence corroborating the assignment. To the extent that the Garrelts argue that there was a "change in [Postier's] testimony,"[15] it was immaterial to HSC's standing in these circumstances.

#### (ii) Review of Factual Finding and
#### Ultimate Question of Standing

Having concluded that there was no abuse of discretion in admitting the written assignment, we need not decide whether to apply the standard of review for a "factual challenge" or the one applying to summary judgment. The Garrelts' challenge fails under either standard.

Under the "factual challenge" standard, we would review the district court's finding that an assignment from HSB to HSC exists for clear error. Here, we see none.

Review under the summary judgment standard fares no better for the Garrelts. To explain why this is so, we recall the applicable summary judgment framework.

---

[13] See, *Kaiser v. Union Pacific RR. Co.*, 303 Neb. 193, 927 N.W.2d 808 (2019); *Momsen v. Nebraska Methodist Hospital*, 210 Neb. 45, 313 N.W.2d 208 (1981).

[14] Brief for appellants at 42.

[15] *Id.*

[10] The party moving for summary judgment must make a prima facie case by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial. If the burden of proof at trial would be on the nonmoving party, then the party moving for summary judgment may satisfy its prima facie burden either by citing to materials in the record that affirmatively negate an essential element of the nonmoving party's claim or by citing to materials in the record demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. If the moving party makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.[16]

To support the Garrelts' motion for summary judgment, they relied upon the absence of a written assignment. But the Bank adduced evidence of a written assignment. We have already determined that there was no abuse of discretion in admitting it. Thus, for purposes of the Garrelts' motion for summary judgment, they failed to prove that they were entitled to judgment as a matter of law. The district court correctly overruled their motion.

[11] We reach an independent conclusion that HSC had standing. An assignee can establish standing to bring an action in its own name, and thus show the court had subject matter jurisdiction, if it proves by the greater weight of the evidence the existence of a written assignment under § 25-304.[17] HSC did so.

## 2. Garrelts Were Liable Under Guaranties

In this section and the next, we address the restated assignments of error pertaining to the Bank's motion for summary judgment. We begin with the Garrelts' contention that

---

[16] *Galloway v. Husker Auto Group, supra* note 7.

[17] See *Western Ethanol Co. v. Midwest Renewable Energy*, 305 Neb. 1, 938 N.W.2d 329 (2020).

the court erred in finding that they were liable for Midwest Auger's debt under the personal guaranties.

[12-15] A guaranty is a contract by which the guarantor promises to make payment if the principal debtor defaults.[18] To determine the obligations of the guarantor, an appellate court relies on general principles of contract and guaranty law.[19] Because a guaranty is a contract, it must be understood in light of the parties' intentions and the circumstances under which the guaranty was given.[20] When the meaning of a guaranty is ascertained, or its terms are clearly defined, the liability of the guarantor is controlled absolutely by such meaning and limited to the precise terms.[21]

The terms of the personal guaranties are clearly defined and drive the conclusion that the Garrelts were personally liable for Midwest Auger's debts, including the $1.5 million loan. Because we provided detailed quotations in the background section, we summarize relevant portions here.

Under the express terms of the personal guaranties, the Garrelts each agreed to be personally liable for the debts of Midwest Auger. The guaranties specifically referred to the promissory note for the $1.5 million loan. They provided that "fail[ure] to make a payment in full when due" would be deemed a default. The Garrelts' liability was not contingent upon the Bank's seeking to enforce the liability of other guarantors. Nor did it depend upon the Bank's giving notice to the Garrelts of renewals or extensions. Although the guaranties were revocable by the Garrelts in writing, there is no evidence of such revocation occurring at any point. The guaranties contemplated future assignment of HSB's interest to an assignee, without notice to the Garrelts, and enforcement of the guaranties by the assignee.

---

[18] *Cattle Nat. Bank & Trust Co. v. Watson, supra* note 5.

[19] *Id.*

[20] *Braunger Foods v. Sears*, 286 Neb. 29, 834 N.W.2d 779 (2013).

[21] *Cattle Nat. Bank & Trust Co. v. Watson, supra* note 5.

[16,17] The Garrelts do not argue that the guaranties are ambiguous, but it seems they would have us ascertain the meaning of the guaranties from other documents. Among other things, they discuss a security agreement, a "Loan Memo,"[22] and an expert witness' report. We decline to do so. A guaranty is a collateral undertaking to answer for the payment of debt or the performance of a contract or duty, and when a guaranty is unambiguous, a court does not vary its terms by construing it with another instrument.[23] Moreover, the undertaking of a guaranty is independent of the promise of the principal obligation.[24]

The court did not err in entering summary judgment against the Garrelts for breach of guaranty.

### 3. Uncontroverted Evidence Defeated Counterclaims

The Garrelts contend that the court erred in granting summary judgment for the Bank on the counterclaims.

### (a) Additional Background

Before addressing the Garrelts' specific counterclaims, we provide additional background. These facts are recited from the parties' evidence and are viewed in the light most favorable to the Garrelts, including the inferences that can reasonably be drawn in their favor.

Prior to 2015, the Garrelts had no affiliation or business with HSB. After signing the guaranties, their interactions with HSB were limited to HSB's demanding payment on the loan. Lynn and his wife were existing customers of HSB and had previously used HSB to finance other entities, including Peck.

Postier was one of the individuals overseeing HSB's loans to Midwest Auger and Lynn's other entities. In 2015, Lynn informed Postier of "his and the Garrelts' joint request" that

---

[22] Brief for appellants at 48.

[23] *Braunger Foods v. Sears, supra* note 20.

[24] *Id*.

HSB extend a line of credit to the entity that would become Midwest Auger. Postier did not have any role in or discussions with Lynn about the plan that Lynn formulated for the new entity. Postier responded that HSB would only extend a line of credit to Midwest Auger if it were subject to the unconditional guaranties of the Garrelts, Lynn, and Lynn's wife, "so HSB's loan would be adequately secured."

Before signing the personal guaranties, the Garrelts did not attempt to verify, through HSB or otherwise, the financial status of Lynn or his other entities. Postier understood Nancy Garrelts to be an "intelligent and well-educated attorney," and he described Todd Garrelts as a "wealthy and sophisticated farmer with a large and successful agriculture operation." Postier understood the Garrelts to be "sophisticated business people" who were "more than capable" of evaluating any business opportunities they entered into with Lynn.

In addition to signing the guaranties, the Garrelts signed a "Limited Liability Company Authorization Resolution" that designated Lynn as the "Manager or Designated Member" of Midwest Auger. The authorization directed HSB to communicate with and take directions from Lynn pursuant to the business affairs of Midwest Auger, including, but not limited to, the line of credit. The Garrelts did not dispute that Lynn was authorized to direct HSB to draw from the line of credit.

At all relevant times, the Garrelts had online access to the bank accounts of Midwest Auger through HSB and were able to follow all financial transactions of Midwest Auger, if they chose to exercise that oversight. It is unclear to the Garrelts what happened to the $1.5 million loaned to Midwest Auger, and there is nothing in the record showing that it was used to purchase the accounts receivable of Peck.

In opposition to the Bank's motion for summary judgment, the Garrelts offered, among other things, a 15-page report in which their expert witness analyzed the "banking practices" of HSB and Postier. The expert described the focus of the report as the "business transactions by HSB for both

P[eck] and [Midwest Auger] from May 19, 2015 forward." After reviewing documents provided by HSB, he opined, in pertinent part: "HSB allowed loan advances to occur without appropriate collateral pledged to support the loan advances and failed to administer or monitor the loan relationship with [Midwest Auger] as a secured loan transaction in customary banking practices."

### (b) Discussion

### *(i) Fraudulent Concealment*

[18] To prove fraudulent concealment, a plaintiff must prove these elements: (1) The defendant had a duty to disclose a material fact; (2) the defendant, with knowledge of the material fact, concealed the fact; (3) the material fact was not within the plaintiff's reasonably diligent attention, observation, and judgment; (4) the defendant concealed the fact with the intention that the plaintiff act or refrain from acting in response to the concealment or suppression; (5) the plaintiff, reasonably relying on the fact or facts as the plaintiff believed them to be as the result of the concealment, acted or withheld action; and (6) the plaintiff was damaged by the plaintiff's action or inaction in response to the concealment.[25]

The Garrelts essentially argue that HSB and Postier had a duty to disclose to them the history and financial information of Lynn and his various entities. We note that the terms of the guaranties did not impose a duty on the Bank to disclose to them information regarding Lynn, his entities, or Midwest Auger. Rather, the terms specifically stated that Midwest Auger had asked them to enter the guaranties, that HSB made no representations upon which the Garrelts relied, and that the Garrelts were satisfied regarding Midwest Auger's financial condition, existing indebtedness, and intended use of the debt proceeds.

---

[25] *Zawaideh v. Nebraska Dept. of Health & Human Servs.*, 280 Neb. 997, 792 N.W.2d 484 (2011), *disapproved on other grounds, State v. Boche*, 294 Neb. 912, 885 N.W.2d 523 (2016).

[19] Our prior cases provide guidance on this issue. We have held that where the surety makes no inquiry on the subject, the duty of disclosure as to facts increasing the risks of the undertaking depends upon the circumstances of the case. Generally, the creditor may assume that the surety has obtained information from other sources or has chosen to assume whatever risks may be involved. A duty of disclosure may arise when the creditor knows or has good grounds for believing (1) the surety is being deceived or misled or (2) the surety has been induced to enter the contract in ignorance of facts materially increasing his or her risks, of which the creditor has knowledge and which the creditor has the opportunity to disclose prior to the surety's acceptance of the undertaking.[26]

Even if we assume, without deciding, that the Bank had an opportunity to provide the Garrelts with what the Bank refers to as the "confidential banking information"[27] of Lynn and his other entities, the Garrelts did not ask the Bank for such information. Moreover, they failed to produce evidence showing a dispute of material fact regarding the existence of any such duty of the Bank.

[20] There is nothing in the evidence to suggest that the Bank knew that the Garrelts were somehow deceived or misled or that they had been induced to enter the guaranties in ignorance of facts materially increasing their risks. Postier understood the Garrelts to be successful business people who were "more than capable" of evaluating the situation. The terms of the guaranties also run contrary to any such suggestion. We have said that deception or ignorance of the facts is not presumed; there must be some evidence that would put the lender on notice that the surety was being deceived or was

---

[26] See *McCormack v. First Westroads Bank*, 238 Neb. 881, 473 N.W.2d 102 (1991).

[27] Brief for appellees at 21.

ignorant of the facts.[28] The Garrelts had the burden of producing such evidence,[29] and they failed to meet it.

[21] It may be that this claim fails on additional elements, but we need not analyze it further. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it.[30]

### (ii) Fraudulent Misrepresentation

[22] A fraudulent misrepresentation claim requires a plaintiff to establish the following elements: (1) A representation was made; (2) the representation was false; (3) when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) the representation was made with the intention that the plaintiff should rely on it; (5) the plaintiff did so rely on it; and (6) the plaintiff suffered damage as a result.[31] In fraudulent misrepresentation cases, whether the plaintiff exercised ordinary prudence is relevant to whether the plaintiff justifiably relied on the misrepresentation when the means of discovering the truth was in the plaintiff's hands.[32]

The Bank points out multiple potential problems with the Garrelts' claim. Among them is the Garrelts' testimony that they did not rely upon any representation made by the Bank when deciding to personally guaranty Midwest Auger's debt. Likewise, that fact is reflected under the express terms of the guaranties. This claim fails.

Another argument made by the Bank is that the Garrelts failed to exercise ordinary prudence. Because we have already determined that the Garrelts cannot prevail, we need not address the Bank's remaining arguments.

---

[28] *Hastings State Bank v. Misle*, 282 Neb. 1, 804 N.W.2d 805 (2011).

[29] See *id.*

[30] *In re Estate of Harchelroad*, 318 Neb. 573, 18 N.W.3d 103 (2025).

[31] *Brauer v. Hartmann*, 313 Neb. 957, 987 N.W.2d 604 (2023).

[32] See *Dietzel Enters. v. J. A. Wever Constr.*, 312 Neb. 426, 979 N.W.2d 517 (2022).

### (iii) Civil Conspiracy

[23,24] A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.[33] A "conspiracy" is not itself a separate and independent tort, but, rather, depends upon the existence of an underlying tort.[34] Without such underlying tort, there can be no cause of action for conspiracy to commit the tort.[35]

To overcome the Bank's motion for summary judgment, the Garrelts needed to produce evidence showing that a genuine issue of material fact existed regarding some underlying tort. Their pleadings alleged that HSB, Postier, and Lynn "conspired to fraudulently conceal and misrepresent" the tenuous financial situation of Lynn and his entities. Viewing the record in the light most favorable to the Garrelts and drawing all reasonable inferences in their favor, the evidence does not establish a factual dispute for either fraudulent concealment or fraudulent misrepresentation. Without an underlying tort, they cannot recover for civil conspiracy.

### (iv) Breach of Implied Covenant of Good Faith and Fair Dealing

[25-27] The implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties do anything which will injure the right of another party to receive the benefit of the contract.[36] The nature and extent of an implied covenant of good faith and fair dealing are measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously, or unreasonably, that conduct exceeds the justifiable

---

[33] *George Clift Enters. v. Oshkosh Feedyard Corp.*, 306 Neb. 775, 947 N.W.2d 510 (2020).

[34] *Elbert v. Young*, 312 Neb. 58, 977 N.W.2d 892 (2022).

[35] *Id.*

[36] *Dietzel Enters. v. J. A. Wever Constr., supra* note 32.

expectations of the second party.[37] The question of a party's good faith in the performance of a contract is a question of fact.[38]

We disagree with the Garrelts that there is a genuine issue of material fact. The guaranties expressly stated that the Garrelts agreed to personally guaranty Midwest Auger's debts in order to induce HSB to extend a loan. HSB loaned Midwest Auger a $1.5 million business operating line of credit. Because it received the benefit of the guaranties, we reject the Garrelts' argument that there was a breach of the implied covenant of good faith and fair dealing and that there was a lack or failure of consideration.

[28] We read the Garrelts' brief to suggest that a factual dispute exists regarding the Bank's conformance to "customary banking practices."[39] However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; only disputes over facts that under the governing law might affect the outcome of the suit will properly preclude the entry of summary judgment.[40] Arguments premised upon customary banking practices exceed the scope of the implied covenant of good faith and fair dealing, which is circumscribed by the terms of the parties' agreement.[41] To the extent that the Garrelts argue "customary banking practices" are relevant to their other counterclaims, such practices are similarly inapplicable.

---

[37] *Id.*

[38] *Id.*

[39] Brief for appellants at 50.

[40] *Cruz v. Lopez*, 301 Neb. 531, 919 N.W.2d 479 (2018).

[41] See *Dick v. Koski Prof. Group*, 307 Neb. 599, 950 N.W.2d 321 (2020) (scope of conduct prohibited by covenant of good faith is circumscribed by purposes and express terms of contract), *modified on denial of rehearing on other grounds* 308 Neb. 257, 953 N.W.2d 257 (2021).

In sum, after conducting a de novo review and viewing the evidence in the light most favorable to the Garrelts and drawing all reasonable inferences in their favor, we conclude that the district court did not err in granting summary judgment in favor of the Bank on the counterclaims.

### 4. Purported Filing of Estate Was Nullity

The Garrelts contend that the district court erred in concluding the purported filing admitting liability on behalf of Lynn's estate was a nullity. We see no dispute that the district court acquired personal jurisdiction of the personal representative of the estate at a time when the estate was still open and Schnurer's appointment was then effective. But the controlling fact is the later termination of Schnurer's appointment before his purported confession of judgment.

[29] Generally, termination of appointment of a personal representative ends the right and power pertaining to the office of personal representative.[42] This is not a novel concept. "When an executor or administrator is finally discharged, all powers and liabilities cease and, unless obtained by fraud, such discharge is binding on all parties appearing until duly set aside."[43]

A statutory exception has no application here. The record contains the probate court's order that "deems the [e]state indigent and without assets to satisfy the numerous claims filed." The probate court relied upon Schnurer's report that Lynn "died with 'no, or virtually no, assets to his name.'" The termination statute does authorize a former personal representative, under certain circumstances, to perform acts necessary to protect the estate's assets.[44] But here, there is no suggestion in the record that there were any estate assets to be protected. Nor did the posttermination action purport to protect any such

---

[42] See Neb. Rev. Stat. § 30-2451 (Reissue 2016).

[43] 33 C.J.S. *Executors and Administrators* § 115 at 827 (2022).

[44] See § 30-2451.

assets. We are aware that Schnurer filed an affidavit asserting that he agreed to the confession of judgment "acting under, not just the authority, but also a continuing *duty*, to *protect* the [e]state . . . and to *preserve* any assets or potential assets." (Emphasis in original.) But his legal conclusion is not supported by facts.

There is no suggestion in the evidence that the termination was obtained through any fraud of the personal representative. We agree that Schnurer's authority to act as personal representative ended before he signed or filed the purported confession of judgment.

Moreover, at the time of the purported confession of judgment against Lynn's estate, Schnurer was not admitted to practice law in Nebraska. He was not acting solely on his own behalf as an individual. Rather, he purported to act on behalf of Lynn's estate. We have said that proceedings in a suit by a person not entitled to practice are a nullity.[45]

We see no error in the court's reasoning that because Schnurer lacked the authority to act on behalf of the estate, the purported filing was a nullity. We express no opinion whether the Garrelts have any other avenue to seek relief against Lynn's estate or against Lynn's heirs or devisees.

## VI. CONCLUSION

We see no abuse of discretion in the evidentiary admission of the written assignment of the personal guaranties. Accordingly, whether viewed using the standard governing a "factual challenge" or using the summary judgment standard, the Garrelts' attack upon the Bank's standing lacks merit.

Our decision is driven largely by the settled principle that when the meaning of a guaranty is ascertained, or its terms are clearly defined, the liability of the guarantor is controlled absolutely by such meaning and limited to the precise terms.

---

[45] See *Niklaus v. Abel Construction Co.*, 164 Neb. 842, 83 N.W.2d 904 (1957).

Regarding the Bank's motion for summary judgment, we find that there was no genuine issue of material fact and that the Bank was entitled to judgment as a matter of law.

Therefore, upon our de novo review, we find no error in granting summary judgment in favor of the Bank and against the Garrelts or in the rejection of the purported confession of judgment.

AFFIRMED.

MILLER-LERMAN, J., not participating.